567 N.E.2d 872 (1991)
In the matter of Y.D.R. and J.C.R. Children Alleged to Be Children in Need of Services.
M.L.R., Appellant (Respondent below),
v.
HARRISON COUNTY WELFARE DEPT., Appellee (Plaintiff below).
No. 31A01-9008-CV-320.
Court of Appeals of Indiana, First District.
March 14, 1991.
*873 Michael A. Gillenwater, Jeffersonville, for appellant.
S. Frank Mattox, Mattox & Mattox, New Albany, for appellee.
ROBERTSON, Judge.
M.L.R. appeals the termination of her parental rights. We affirm.
The Harrison County Department of Public Welfare (DPW) removed Y.D.R. and J.C.R. from their father's home on May 15, 1987, pursuant to an emergency order of detention. At the time of removal, the mother, M.L.R., was living in a shelter for battered women. The father was an alcoholic. The trial court ordered that the mental health of both children be professionally evaluated and that the DPW retain custody of them. Although a hearing was held at this time, it was not recorded.
Approximately a month later, the DPW sought court authorization for the filing of a CHINS petition, alleging that the physical and mental conditions of the children were being seriously injured or endangered due to the inability, refusal, or neglect of the parents to supply the children with necessary food, clothing, shelter, medical care, education or supervision. Psychological evaluations completed during August of 1987, pursuant to the emergency detention order, showed that the younger child, J.C.R., age six, had a normal to high normal *874 intelligence quotient but suffered from profound childhood depression characterized by low self-esteem, a negative self-attitude, very reactive depression and a sense of loss in the family unit. He was in extreme emotional pain and described events in the household which were unquestionably malicious and abusive. Improvement in his condition would require a great deal of counseling, warmth, positive but firm responses from his caretakers, consistency, and positive interaction between adults.
Y.D.R., age seven years, six months, was undernourished and showed signs of emotional and social deprivation. When first tested, Y.D.R.'s IQ fell in the mildly mentally handicapped range and she was at high risk for significant learning problems. Apparently the product of an emotional environment exceptionally deprived of appropriate modeling, and typical of children who have experienced severe abusive trends in family patterns, she reflected severe expressive motor and cognitive language delay. However, when tested a second time, after a brief period in foster care, she showed significant gain, exhibiting the potential for normal intellectual functioning given appropriate stimulation. Hence, it was perceived that she had been raised in an environment devoid of most basic emotional responses and that familial and social/cultural factors had served to depress her intellectual development.
Y.D.R.'s social development had also been inhibited. She had not yet been toilet trained, was extremely shy, had nervous habits and dietary problems, was dominated by her brother and did not want to be touched by males. She regressed markedly when visited by her mother; consequently, it was recommended that the court exercise extreme caution in exposing her to her mother and that she be returned to her mother only upon the recommendation of qualified mental health professionals. It was also recommended that Y.D.R. be placed in an environment with normalized responses. The more abuse and emotional flux that occurred, the greater Y.D.R.'s chances that she would be permanently affected.
A few days after the filing of the psychological evaluations, the court entered an order authorizing the filing of a CHINS petition. On October 28, 1987, the court held an initial hearing on the petition at which both parents, each represented by legal counsel, stipulated to the facts alleged. The court entered two orders at this time, the first showing the parents' admission of the facts alleged and ordering the parents to participate in individualized counseling and supervised visitation until they had substantially complied with previous and current counseling recommendations of the DPW. The second order contains the trial court's findings of fact, approving and incorporating the case plan prepared by the DPW which specifies the children's needs and the responsibilities of the parents. In addition, the court found that the parents had failed to comply with prior counseling requests and that the children were doing exceptionally well in foster care with an increase in intellectual, emotional and physical health.
The court held review hearings on April 20, 1988, and September 25, 1988 continued to October 12, 1988, during which evidence was taken but not recorded. It issued orders after each hearing incorporating updated case plans and directing the mother to attend counseling related to the nurturing of her children. Following the April 20, 1988 hearing, the court granted the DPW permission to petition for termination of parental rights. Ultimately, hearings on the petition were held on September 25, 1989, December 7, 1989, and January 12, 1990. While a ruling on the petition was pending, the court held a final review hearing. On April 11, 1990, it entered its findings and judgment on the petition for termination which is the subject of this appeal.
M.L.R. maintains:
(1) that she never received a dispositional hearing or dispositional decree which satisfies the requirements of Ind. Code 31-6-5-4; XX-X-X-XX.3; and XX-X-X-XX;
(2) that she was denied procedural due process by the court's failure to provide *875 her notice of the conditions which prompted the removal of the children from her home so that any deficiencies or problems which existed could be addressed and corrected;
(3) that the trial court's factual findings in support of its decision to terminate her parental rights are not sustained by the evidence;
(4) that cohabitation with a suspected child molester is insufficient to establish unfitness as a parent justifying a termination of parental rights; and,
(5) that under the totality of the circumstances and evidence a termination of parental rights in this case would be unjust.

I.
M.L.R. argues first that a dispositional hearing was never held and that the dispositional decree required by I.C. 31-6-5-4 before a termination of parental rights may be granted was never entered. Although it is true that the court never entered an order labeled "Dispositional Decree," the record evinces that a dispositional hearing complying with the dictates of I.C. XX-X-X-XX.3(a) was held and that an order with written findings and conclusions containing the court's reasons for the disposition, the needs of the children for care, treatment, and rehabilitation, the need for participation by the parents in the plan of care for the children, efforts made to reunite the children with the mother, and the family services offered and provided was issued and made a part of the record. Since the allegations of the petition were admitted by M.L.R., the court properly could hold a dispositional hearing immediately following the initial hearing on the CHINS petition, without holding an independent fact finding hearing. I.C. XX-X-X-XX.5(i); I.C. XX-X-X-XX(a).
In her argument on this issue, M.L.R. contends that I.C. 31-6-5-4 and XX-X-X-XX.3 must be considered in relation to I.C. XX-X-X-XX which addresses the modification of a dispositional decree. In a single sentence, she cites as a shortcoming of the proceedings, the fact that there is no record of "an advice [sic] of rights to the children or their parents" as required by I.C. XX-X-X-XX.3(f) (1987).[1]
Even were we to assume that subsection (f) applies to M.L.R., her brief does not demonstrate how the court's failure to advise of the procedures for modification of a dispositional decree ultimately prejudiced her. The record must reveal the error assigned as the basis for the reversal sought. The burden of showing reversible error is on the appellant, M.L.R. Raymundo v. Hammond Clinic Association (1983), Ind., 449 N.E.2d 276, 280.

II.
M.L.R.'s claim that she was denied procedural due process by the trial court's failure to specify in the record the conditions prompting removal of the children is also without merit. M.L.R.'s argument turns upon her construction of "removal" as the date on which the children were actually taken into custody. However, I.C. 31-6-5-4(c)(1) requires that the county department allege, and ultimately it must prove, that the children have been "removed from the parent for at least six (6) months under a dispositional decree." The phrase "the conditions that resulted in the child's removal" found in (c)(2) thus refers for purposes of termination to removal under a dispositional decree.
In the present case, the children were not residing with M.L.R. when they were first taken into custody. She had left them with their alcoholic and abusive father and was residing in Louisville, Kentucky in a shelter for abuse victims. Consequently, the grounds necessitating removal from the home of the father would not have been those applicable to M.L.R. However, following psychological examinations of the children, other grounds emerged justifying removal of the children from M.L.R. These were fully and completely identified *876 in the case plan and became the basis of the court's dispositional decree with respect to M.L.R. As we indicated in In the Matter of D.T. (1989), Ind. App., 547 N.E.2d 278, in response to a similar allegation of procedural due process deprivation, new CHINS proceedings need not be initiated each time additional grounds for intervention are discovered by the DPW.

III.
M.L.R. also takes issue with the trial court's findings of fact. She alleges that the trial court misstated or misconstrued the evidence.
In particular, M.L.R. challenges the trial court's finding that she abandoned her children. What the trial court found was that "[t]he deposition of Caseworker Rebecca Streepy relates that the Harrison County Department of Public Welfare received a report that the children had been abandoned by the natural mother and were with their father, who was not taking them to school and who had threatened them with a gun."
M.L.R. also contests the finding that both of M.L.R.'s therapists were of the opinion that M.L.R. was incapable of providing the children with a nurturing environment. This conclusion was expressed repeatedly by M.L.R.'s primary psychologist, Mr. Levy. (R. 580, 584, 588, 604, 626.) He stated this as his impression of M.L.R. initially and confirmed that her ability to nurture had essentially remained unchanged despite his efforts over two and one-half years and sixteen sessions to develop a therapeutic relationship with her. Her ability to respond appropriately to Y.D.R. and J.C.R. had been stressed even further following the births of two more children.
Though therapist Sally Connelly did not choose the same language, she expressed the opinion that, during the period of January, 1988 through April, 1988, M.L.R.'s inability to take care of herself never changed; and Connelly could not imagine how she could ever take care of children. Her relationship had ended with M.L.R. because M.L.R. had dropped out of counseling. Though she hadn't seen M.L.R. for some time, Connelly had not heard anything from or about M.L.R. which would lead her to believe that things had changed; neither did she believe, given the severity of M.L.R.'s dysfunction, that she had likely progressed. M.L.R.'s desire to put the children in a situation she knew to be potentially abusive indicated to Connelly that M.L.R. was unable to make healthy and appropriate choices for her children.
Lastly, M.L.R. disputes the evidentiary basis for the trial court's finding that the children had been in foster care for two and one-half years with little meaningful contact by either natural parent. The evidence relating to the extent and nature of M.L.R.'s visitation supports various inferences. In reviewing the sufficiency of the evidence to sustain the trial court's findings, this court may not reweigh the evidence or judge the credibility of witnesses. We may not set aside the findings or judgment unless clearly erroneous. In the Matter of D.T., 547 N.E.2d at 284.
The testimony shows that when the children were first removed from the father's home, M.L.R. visited fairly regularly, once a week or once every other week, but then at some point, she stopped visiting with the children as frequently. She was urged to call her children everyday. When she had access to a phone, M.L.R. would call 13 to 14 times per month; when she didn't have a phone in her home she didn't call at all. She called one time in March and April, 1989, and thereafter, went until August, 1989 without making any contact. Though the children wrote letters to her, she did not respond. Visitations did increase as the hearing on the petition to terminate drew near. The DPW provided her with transportation and her therapist attempted to work through her unwillingness to see the children, but M.L.R. resisted.
Many of the times M.L.R. visited with the children at the foster home, she would engage in discourse with the adults while the children played outside or downstairs. She was encouraged by the foster parents to go down and play with the children. Sadly, she visited with them as she would a *877 friend, without displaying the emotion of a mother who had been separated from her children. M.L.R. was permitted to have extended visitations with the children in her home. These were usually not productive, particularly for Y.D.R. who regressed after every visit. On one occasion, Y.D.R. reported that her mother left her at home to baby-sit with her step-siblings, a two-month-old baby and two-year-old, while J.C.R. and M.L.R. went to the store. Y.D.R., then nine, was terrorized by conversations she had overheard concerning burglaries in the neighborhood and ran about the house locking the doors and windows.
These are the facts most favorable to the judgment. They are sufficient to show "little meaningful contact."
Finally, M.L.R. reiterates all of the evidence favorable to her which she maintains the trial court failed to acknowledge or present objectively so that the matter could be reviewed upon appeal. True, many of the facts cited by M.L.R. are uncontroverted. The question, however, is the weight to be accorded these matters in light of the other testimony. Again, it is the function of the trial court, not this court, to weigh the evidence. The record contains more than adequate evidence in support of the trial court's findings and judgment.

IV.
M.L.R. argues next that the trial court gave undue weight to the fact that she was cohabitating with a man suspected of being a convicted child molester. In part, she contests the evidence establishing that her boyfriend was the person named in the judgment of conviction. She also contends that the court heard no testimony regarding his fitness or present ability to care for the children.
The trial court's findings evince that it did consider the DPW's concerns about M.L.R.'s relationship with a person who M.L.R. admitted at one point to her therapist had been convicted of child molesting. We find nothing inappropriate about the court's action in doing so. See I.C. 31-6-5-5 (Conviction of child molesting prima facie evidence of reasonable probability that conditions will not be remedied). The DPW offered the testimony of the caseworker involved in investigating and prosecuting the allegations, who identified M.L.R.'s boyfriend as the person charged and convicted. Suffice it to say, the circumstances leading to M.L.R.'s boyfriend's conviction would make a stable parent concerned about the welfare of her children. Yet, M.L.R. chose to deny the potentially abusive nature of the environment she was living in and did not take any action to alleviate the DPW's concerns. Though counseling services were offered to M.L.R.'s boyfriend, both the DPW caseworker and M.L.R.'s therapist testified that they were rejected.
In any event, as we have indicated, there is a considerable amount of evidence in support of the trial court's other numerous findings and conclusion that termination would be in the best interests of the children. Quite simply, a normalized emotional setting was the only chance the children would have of overcoming the effects of the extreme emotional deprivation they had experienced in the past.

V.
In the last section of her brief, M.L.R. relies upon "the court's sense of justice to determine that a termination of parental rights under all the circumstances would be unjust." Essentially, M.L.R. complains about the long delays between proceedings and the sufficiency of the evidence overall.
It is M.L.R.'s burden as an appellant to demonstrate that the delays which occurred over the course of proceedings ultimately harmed her. The record reflects that the petition to terminate was filed early in the proceedings but action was not taken on it for over a year. Even when a ruling was pending, M.L.R. had the benefit of a review hearing, which would have given her an opportunity to demonstrate *878 that she was taking advantage of all means available to her to improve her situation.
The evidence permits the conclusion that M.L.R. was either unable or unwilling to respond to the emotional needs of her children. The correctness of this conclusion becomes more apparent as the record progresses. Accordingly, we are compelled to affirm the trial court.
Judgment affirmed.
BAKER and SHARPNACK, JJ., concur.
NOTES
[1] I.C. XX-X-X-XX.3(f) reads:

The juvenile court shall advise the child and the child's parent, guardian, or custodian of the procedures under I.C. XX-X-X-XX.