**In the Matter of the Termination of the Parent–Child Relationship of C.D. and R.D., minor children,**

**and**

**William F. DRAPER, Appellant–Natural Father,**

**and**

**Carolyn Knauer, Appellant–Natural Mother,**

**v.**

**TIPPECANOE COUNTY DEPARTMENT OF PUBLIC WELFARE, Appellee–Petitioner.**

No. 79A04–9202–JV–52.

Court of Appeals of Indiana, Fourth District.

May 26, 1993.

Transfer Denied July 14, 1993.

**592**

Michael B. Troemel, Merritt, Troemel, Meyer & Hamilton, Lafayette, IN, Steven Knecht, Lafayette, IN, for appellants.

Dennis L. Woods, Fowler, IN, for appellee-petitioner.

CHEZEM, Judge.

### Case Summary

Respondent–Appellant Carolyn Knauer (Mother), and Respondent–Appellant William Draper (Father), appeal the termination of the parent-child relationship between themselves and their children, C.D. and R.D. We affirm.

### Issue

Mother and Father present several issues for our review, which we consolidate as follows: Whether there was clear and convincing evidence to support termination of the parental rights of Mother and Father.

### Facts and Procedural History

The trial court made specific findings of fact and conclusions of law. The pertinent findings of fact are:

1. C.D. and R.D. were found to be children in need of services [CHINS] on April 11, 1988.

2. The children were placed in the custody of the Tippecanoe County Department of Public Welfare....

3. The father was afforded opportunities for visitation with the children commencing in September of 1987, but was unable to relate to the children; refused to cooperate with caseworkers supervising the visitations; refused to take instruction and advice regarding interaction with the children by the caseworkers of the Department of Welfare or counselors providing services to the children; all of which, according to experts, had a damaging effect on the emotional well-being of the children.

4. The father failed to cooperate with service providers and therapists in completing evaluations geared toward reunification; failed repeatedly to make telephone contact with the children as scheduled on a weekly basis; and when making telephone contact continued to communicate inappropriately with the children leading to further emotional damage of the children.

5. The mother voluntarily absented herself from the children, without any contact whatsoever, from August of 1988 to July of 1991, during which time the mother was wholly unavailable to participate in services offered by the Department of Public Welfare for the purpose of reunification with the children.

6. There is a reasonable probability the conditions which resulted in the removal of these children will not be remedied in that the father has evidenced no indication of his willingness to modify his behavior and beliefs regarding physical punishment of the children and due to his long periods of voluntary absence from the children since they were infants, it is unreasonable to assume given his history that he will be able to adequately parent these children and provide for their emotional needs. Furthermore, based on the testimony of experts, it is unreasonable to assume that the mother has matured or can mature to a point where she can provide for the protection of the children, stability of the children, and for their physical and emotional needs.

7. These children are now seven (7) and eight (8) years old and both parents have repeatedly and for long periods of time voluntarily absented themselves from the children to the extreme detriment of the children and to the extent that there is no reason to now believe that the parent-child relationship bond can be reestablished; furthermore, based on evidence at trial, efforts at this point to reunify with mother or father would be detrimental to the emotional well-being of both children.

8. Termination of the parent-child is in the best interest of these children in that they have suffered severe emotional difficulties as a result of their parents' frequent and long-term voluntary absences; failure of the parents to adequately protect them; physical abuse of

the father and former step-father; and continued contact with the parents would be detrimental to the long-term emotional and mental health and well-being, as well as physical well-being of the children.

9. The Tippecanoe County Department of Public Welfare has a satisfactory plan for the care and treatment of the children, that being immediate adoption of said children.

The DPW filed a petition to terminate Mother's and Father's parental rights in December 1990. Following an evidentiary hearing, at which Mother appeared in person and by counsel, and Father appeared by counsel, the trial court granted the petition.

### Discussion and Decision

In order to effect the involuntary termination of a parent-child relationship, the DPW must present clear and convincing evidence to establish each element of I.C. 31–6–5–4(c). *Shaw v. Shelby Co. Dept. of Public Welfare* (1992), Ind.App., 584 N.E.2d 595, 597. I.C. 31–6–5–4(c), as it existed at the time of the present action, required proof that:

(1) the child has been removed from the parent for at least six (6) months under a dispositional decree;

(2) there is a reasonable probability that:

(A) the conditions that resulted in the child's removal will not be remedied; or

(B) the continuation of the parent-child relationship poses a threat to the well-being of the child;

(3) termination is in the best interests of the child; and

(4) there is a satisfactory plan for the care and treatment of the child.

■ On appeal of a termination of parental rights, we will not reweigh the evidence nor judge the credibility of witnesses. We will consider only the evidence most favorable to the judgment and the reasonable inferences drawn therefrom. *Matter of Tucker* (1991), Ind.App., 578 N.E.2d 774, 777, *trans. denied.* Where the trial court enters specific findings of fact

and conclusions of law, we apply a two-tier standard of review. First, we determine whether the evidence supports the findings and then whether the findings support the judgment. The trial court's findings and conclusions will be set aside only if clearly erroneous. *Id.*

■ The evidence presented at the termination hearing established that the children had been removed from the parents for over a year, under a dispositional decree. Father contends that the children were not removed from him, and that the reasons for removing the children had nothing to do with him. He cites to *Matter of A.M.* (1992), Ind.App., 596 N.E.2d 236, *trans. denied,* to support his position that the children must be removed from his actual custody in order to terminate his parental rights. In *Matter of A.M.*, the biological father was never allowed to exercise his parental rights because the DPW did not believe he had the ability to parent. The child was not removed from his care because he had never cared for the child. Such is not the case with Father in the present case. Father lived with the children when he was married to Mother. Mother gained custody of the children after the divorce, and Father was awarded visitation rights.

We cannot say the CHINS dispositional decree did not remove the children from Father as well as Mother. The grounds necessitating the emergency detention of the children from Mother's home would not have been applicable to Father, but further psychological examinations of the children and Father revealed other grounds justifying removal of the children from Father. These grounds were brought out at the CHINS hearing and became a basis of the dispositional decree. *Matter of Y.D.R.* (1991), Ind.App., 567 N.E.2d 872. A new CHINS proceeding need not be initiated each time an additional ground for intervention is discovered by DPW. *Id.*

The CHINS court found that Father had disciplined the children beyond the point of reasonable corporal punishment, amounting to physical and emotional abuse, and

without evidence that his beliefs on corporal punishment had changed, assumed he would continue to discipline the children as he had in the past. Based on this evidence, the court ordered that the children remain in foster care, out of the custody of both Mother and Father. Mother testified that Father struck C.D. with a paint stirrer when she was four (4) months old because she would not calm down in church. In his deposition, Father stated that he hit C.D. every week to ten days with a paint stirrer. Father's visitation was ordered supervised by DPW and a program devised to allow him to show he could properly resume the role of parent to the children. The children were removed from Father for a period of six months under a dispositional decree pursuant to I.C. 31–6–5–4(c). *Matter of Robinson* (1989), Ind., 538 N.E.2d 1385.

Both Mother and Father argue that the DPW failed to prove by clear and convincing evidence that the conditions which resulted in the children's removal would not be remedied. The evidence presented at trial established that Mother was evaluated by Dr. Andrea Weiland, a clinical psychologist, in September/October 1987. Based on her evaluation, she found it unlikely that Mother could adequately parent the children if reunification were attempted.

Janet Fritton, Court Appointed Special Advocate (CASA), testified that Mother was offered a parenting class by the DPW, but failed to complete the class. She also testified that Mother did not exercise consistent visitation with the children prior to August 1988. Dr. David Jarmon, a clinical psychologist, performed a psychological examination on Mother in August 1991. At the hearing he testified that, at that point, he did not know if Mother could appropriately care for her children. He also concluded that her ability to bond with her children was questionable at that point because of her long absence.

Mother testified she did not have any contact with her children from August 1988 to August 1991. She stated she left Lafayette because she was frustrated with her situation. She also did not inform DPW or her children of her new address or that she had remarried in May 1988. While she and her new husband were gone, Mother did not participate in any parenting classes or take any other steps to improve her parenting skills. She returned to Ft. Wayne in September 1990, but did not inform the DPW of her return until July 1991, when she was served notice of the hearing to terminate her parental rights.

Father's first contact with DPW occurred in September 1987, when he petitioned for visitation with the children. Father did not have any contact with the children for fifteen months prior to contacting the DPW. The visits began at two (2) hours per month and were supervised by DPW. In April 1989 the visits were increased to four (4) hours per month. Between August 1988 and November 1989, Father attended two visits with his daughters. When Father moved from Florida to Lafayette, his visits were increased to two hours per week. In addition to allowing visitation, the court also allowed Father weekly telephone calls to the children.

Carolyn Kamp, a former DPW caseworker, testified she worked with this case until August 1991. Her main contact was with Father when she supervised approximately thirty (30) visits. Kamp stated that Father missed making thirty-three (33) weeks of scheduled calls to the girls between April and December 1990. While she supervised visits she noticed a significant deterioration in the way Father and the children interacted. At the last visit in December 1990, the girls would have nothing to do with Father. Father acknowledged there were problems with the visits, but he did not follow through with the recommendations for improvement.

Dr. Linda Corrigan, clinical psychologist, evaluated Father concerning his beliefs on corporal punishment. She concluded that he demonstrated a limited capacity for impulse control. She found Father to be inflexible and not able to adapt to change. She did not regard him as a good candidate for psychotherapy. His responses to the tests suggested he had the potential for continued violent or abusive behavior and

could not ascertain or attend to the needs of the children. When asked about his views on corporal punishment of young children, he answered he would stop for the period required by the DPW but would resume his way of discipline when the restriction was lifted.

Father hired Dr. Robert Ten Eyck, a clinical psychologist, to do a psychological evaluation of him. Dr. Eyck concluded he did not think Father would be dangerous toward the children if they were in his custody. He testified he did not think it would be in the girls' best interests to live with Father.

Dr. Elizabeth Akey was the only clinical psychologist who observed Father interacting with the children. She concluded after this observation and interviews with the girls that their relationship with Father was strongly negative. Because repeated attempts over two years had failed to modify the situation so that a positive relationship could be developed, she believed further reunification efforts could result in psychological and behavioral problems for the girls.

The DPW also presented evidence concerning the best interests of the children. Dr. Akey testified that she believed it would be in the girls' best interests to suspend visitation with Father and refrain from further attempts to reunify the girls with Father. With regard to Mother, Dr. Akey also believed it would be in the best interests of the girls to terminate the relationship.

Dr. Weiland believed that because both parents had been absent for more than half of the children's lives, they do not know Mother and Father as their parents. Their safety and security came from the foster parents, who had been caring for them for most of their lives. She did not think the lack of contact with Mother and Father could be overcome by C.D. and R.D.

Marybeth Jansky, a clinical social worker, supervised visits and telephone calls between Father and the girls. She observed that the girls' way of relating with Father became increasingly negative over the course of the contacts. She also observed that the children became regressive after visits with Father.

Janet Fritton also believed termination would be best concerning both parents. In Father's case, she believed he had not shown a propensity to change and had spent his visits with his daughters putting them on the defensive and not developing a positive relationship. In Mother's case, she believed the three year absence with no contact with the girls would have a negative effect on the girls.

The trial court's finding that Father had not changed his views on corporal punishment or that he would be unable to provide for the children's needs has sufficient evidentiary support. The finding that Mother cannot adequately provide for the children's needs is also supported by the record. The evidence further supports the trial court's findings that termination is in the best interests of C.D. and R.D. and that DPW devised an adequate plan for the care and treatment of the children. The DPW established each element of I.C. 31–6–5–4(c) by clear and convincing evidence. The judgment terminating the relationship between C.D. and R.D. and their parents is supported by sufficient evidence.

Father argues that termination is inappropriate unless the situation while in custody of the parent would be wholly inadequate for the child's survival. *Matter of Tucker*, 578 N.E.2d at 778. However, we further stated in *Tucker* that "[t]his is a graduated yardstick according to which the particulars of a case must be measured. In so doing, the trial court must subordinate the interests of the parent to those of the children involved." *Id.* The evidence shows here that the children had been subjected to physical and mental abuse and unstable living situations. No evidence was presented to show these conditions would be remedied. The trial court need not wait until the children's physical, mental and social growth is harmed before terminating the parent-child relationship. *Matter of D.T.* (1989), Ind.App., 547 N.E.2d 278, 286, *reh. denied, trans. denied*. Ac-

cordingly, we affirm the judgment of the trial court.

Affirmed.

RUCKER, J., concurring.

CONOVER, J., dissenting with opinion.

CONOVER, Judge, dissenting.

I respectfully dissent as to termination of Carolyn's parental rights.

The evidence best supporting the judgment indicates William and Carolyn were married in 1983; C.D. was born a year later. The parents disagreed on methods of child discipline. William, on religious grounds, believed he had the right to physically discipline both his wife and newborn daughter if their conduct displeased him. On several occasions he "spanked" C.D. with a paint stirrer, a thin ruler-sized piece of wood, first when she was four months old because her crying annoyed him. R.D. was born in 1984.

William's relationship with Carolyn and his daughters continued to be alternately tolerable, then stormy. It included corporal punishment and stern verbal discipline of his infant daughters, and William's unprovoked beatings of Carolyn both when she attempted to intervene during William's disciplining of his daughters, and otherwise. Finally, Carolyn left William, returned, then left again with her daughters when the beatings began again, seeking protection for them in a battered women's shelter. She sued for divorce in 1985, which was granted in 1986. The court awarded custody of the children to Carolyn. She subsequently remarried, but left the new husband when he, too, proved to be a child beater. Finally, Carolyn left her daughters with a friend, then left to roam the country. DPW eventually intervened, and provided them with a foster home. Meanwhile, Carolyn remarried, happily this time, and she and her new husband now operate a successful janitorial service in Michigan.

At DPW's initiation, C.D. and R.D. were declared children in need of services in 1988. DPW's social worker and psychologist witnesses testified she has made only sporadic efforts to stay in touch with her children over the years.

DPW witnesses also complain although she has tried to learn the "parenting skills" DPW believes she should possess, she is incapable of doing so. On this score, the trial court found

6. ... [B]ased on the testimony of experts, it is unreasonable to assume that the mother has matured or can mature to a point where she can provide for the protection of the children, stability of the children, and for their physical and emotional needs.

.   .   .   .   .

8. Termination of the parent-child relationship is in the best interest of these children in that they have suffered severe emotional difficulties as a result of the parents' frequent and long-term voluntary absences; [their] failure to adequately protect them; physical abuse of the father and former step-father; and continued contact with the parents would be detrimental to the long-term emotional and mental health and well-being, as well as physical well-being of the children....

(R. 82–83). From the judgment terminating their parental rights, William and Carolyn appeal.

Even though troubling given the nature of the appeal before us, I believe this record contains substantial evidence of probative value which supports termination of William's parental rights. I believe so because the evidence and testimony as to him stands unrefuted in this record and is internally consistent. I thus concur with the majority on that score.

However, as to Carolyn, I respectfully dissent. The evidence presented by the DPW upon which the trial court based its termination of Carolyn's parental rights does not rise to the quality required before parental rights can be terminated. In sum, its quality is not "clear and convincing" in that regard.

As our United States Supreme Court has noted, cases where constitutional rights and federal due process are involved entail

a substantially higher standard of proof than the typical civil damage case. Explaining the difference, Chief Justice Burger said:

The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to "instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *In re Winship*, 397 U.S. 358, 370, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring). The standard serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision.

Generally speaking, the evolution of this area of the law has produced across a continuum three standards or levels of proof for different types of cases. At one end of the spectrum is the typical civil case involving a monetary dispute between private parties. Since society has a minimal concern with the outcome of such private suits, plaintiff's burden of proof is a mere *preponderance of the evidence.* The litigants thus share the risk of error in roughly equal fashion.

In a criminal case, on the other hand, the interests of the defendant are of such magnitude that historically and without any explicit constitutional requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment. In the administration of criminal justice, our society imposes almost the entire risk of error upon itself. This is accomplished by requiring under the Due Process Clause that the state prove the guilt of an accused *beyond a reasonable doubt. In re Winship, supra.*

The *intermediate standard,* which usually employs some combination of the words "clear," "cogent," "unequivocal," and "convincing," is less commonly used, but nonetheless "is no stranger to the civil law." *Woodby v. INS*, 385 U.S. 276, 285, 87 S.Ct. 483, 488, 17 L.Ed.2d 362 (1966).... The interests at stake in those cases are deemed to be more sub-

stantial than mere loss of money and some jurisdictions [including Indiana] accordingly reduce the risk to the defendant ... by increasing the plaintiff's burden of proof. Similarly, this Court has used the "clear, unequivocal and convincing" standard of proof to protect particularly important individual interests in various civil cases. [such as deportation and denaturalization cases]. (Emphasis and comment supplied).

*Addington v. Texas* 441 U.S. 418, 423–424, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979). The Chief Justice continued in *Addington* by candidly admitting efforts to analyze what factfinders actually understand concerning the differences among these three tests "may well be largely an academic exercise...." *Id.*, 441 U.S. at 424, 99 S.Ct. at 1808. Closing the subject, he added:

[E]ven if the particular standard-of-proof catchwords do not always make a great difference in a particular case, adopting a "standard of proof is more than an empty semantic exercise." (citing cases) In cases involving individual rights, whether criminal or civil, "[t]he standard of proof [at a minimum] reflects the value society places on individual liberty." (Quotes and comments in original).

*Addington*, 441 U.S. at 425, 99 S.Ct. at 1809.

The time-honored right of parents to establish a home and raise their children is protected by the Fourteenth Amendment to the United States Constitution. Parental rights, however, may be terminated not only in situations where the child is in immediate danger of losing its life, but also where the child's emotional and physical development are threatened. This is a graduated yardstick according to which the particulars of a case must be measured. In so doing, the trial court must subordinate the interests of the parent to those of the children involved. *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925); *Egly v. Blackford County DPW* (1992), Ind., 592 N.E.2d 1232, 1234; *Matter of Tucker* (1991), Ind.App., 578 N.E.2d 774, 778–779, *trans. denied.* Before a court may terminate constitution-

ally-protected parental rights, a DPW must prove each required allegation of the termination statute, IND. CODE 31–6–5–4, by "clear and convincing" evidence. *Matter of Tucker*, 578 N.E.2d at 776–777.

Just as the burden of proof below is substantially enhanced when, as here, constitutional rights and liberties are put at civil risk, the standard of review at the appellate level is correspondingly more stringent. We, too, are to have in mind "the value society places" on individual constitutional rights in such cases. Because constitutional rights are here involved, we must in our review determine whether the proof below rose to the "clear and convincing" level required as a matter of law in such cases. Our query is whether substantial "clear and convincing" evidence was presented below which supports the trial court's judgment. This question goes not to the burden of proof because weighing the evidence is the exclusive province of the factfinder. It goes to the quality and nature of the evidence upon which the judgment below is based in such cases. *Woodby v. INS*, 385 U.S. 276, 87 S.Ct. 483, 487, 17 L.Ed.2d 362 (1966).

In Indiana, we have a two-tiered standard of review when determining sufficiency of the evidence to support a judgment:

> Determining whether the evidence is sufficient requires both a quantitative and qualitative analysis ... Quantitatively, evidence may fail only if it is absent, that is only where there is none at all. Qualitatively, however, it fails when it cannot be said reasonably that the intended inference may logically be drawn therefrom. The failure of inference may occur as matter of law when the intended inference can rest on no more than speculation or conjecture.

*Carbo, Inc. v. Lowe* (1988), Ind.App., 521 N.E.2d 977, 980, *trans. denied. Carbo* involved only a negligence case between private parties. I believe it necessary to restate this standard of review within the context of this case, as follows:

> When a civil case involves the forfeiture of an individual's constitutionally-protected parental rights, we review to

determine whether the evidence supporting each statutorily-required element of the state's case

(a) was quantitatively present, and, if so,

(b) was of a "clear and convincing" quality rather than evidence which merely preponderates.

Because I believe it readily apparent none of the evidence supporting the trial court's judgment terminating Carolyn's parental rights rises to the qualitative level of "clear and convincing" as a matter of law, reversal of the trial court is required in Carolyn's case, in my opinion.

Clearly, the trial court based its decision almost wholly upon the opinions of the DPW's social worker and psychologist witnesses. The substance of that testimony was (a) Carolyn had failed to attend parenting classes, (b) she probably would never be able to parent, and (c) without notice to anyone, she secretly re-married and left the area. Even when she returned, she did not immediately notify DPW of her whereabouts or inquire about the well-being of her children until seven months later. Her children were then 7 and 8 and it had been three years since they last saw or heard from Carolyn, and she had lived in 5 different residences in the year preceding the termination hearing.

In all the DPW's evidence quantitatively, however, there is not even a hint, let alone an inference, these children would be in physical or emotional danger if they were in Carolyn's and her present husband's custody. (R. 344, 981–983). Thus, the linchpin of parental right termination is missing in this case. *Egly*, 592 N.E.2d at 1234. The expert opinion advanced and relied upon below, *in the context of a parental rights termination proceeding*, is flawed and internally inconsistent, i.e., it is not "clear and convincing" as a matter of law.

One of DPW's expert opinions that Carolyn would never be able to "parent" was based on an examination done in 1987, some 5 years before trial without follow-up by the testifying psychologist. To the contrary, another psychologist who examined Carolyn in 1991 testified she would pose no physical danger to her children, had the

capacity to form an emotional bond with her children, and could adequately learn parenting. (R. 1263, 1265).

In August of 1991, Carolyn encountered her children at a McDonald's in Ft. Wayne. The girls begged her to accompany them to a Show Biz Pizza restaurant, which she did. According to Carolyn's unrefuted testimony, the children appeared to enjoy this visit; they hugged and kissed her, and told her that they loved her. (R. 346–350). A DPW caseworker testified the children appeared to be in the best emotional and mental state in which she had ever seen them. (R. 653).

From my review of this record, it appears to me the trial court terminated Carolyn's parental rights based almost wholly upon expert psychological opinion which under the peculiar circumstances of this case borders on guesswork and speculation. At most, DPW's alternative would provide the children a better place to live. That is not the test in *Egly*.

Further, the DPW's evidence is not "clear and convincing" as a matter of law because it is internally inconsistent. Some of its witnesses believe Carolyn can "parent," others not. The undisputed facts indicate Carolyn's children love her and want to be in her company. To terminate parental rights simply because some government experts opine an individual is incapable of "parenting" without more, has an Orwellian connotation utterly inconsistent with our constitutional approach to such matters.

Without question, in my opinion, this evidence does not meet the *Egly* standard for termination of parental rights, and is not "clear and convincing" as a matter of law. The trial court's judgment as to Carolyn's parental rights should be reversed and this case remanded for a new trial as to her.