Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Apr 29 2014, 9:54 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MICHAEL B. TROEMEL**
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General
Indianapolis, Indiana

**DAVID E. COREY**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of L.W., J.W., M.T., L.P., C.L.Q., and C.Q. minor children, and L.W., Mother, | ) ) ) ) |
| L.W., | ) ) |
| Appellant-Respondent, | ) ) |
| vs. | ) ) No. 79A02-1308-JT-721 |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) |
| Appellee-Petitioner. | ) |

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Faith A. Graham, Judge
Cause Nos. 79D03-1302-JT-13, -14, -15, -16, -17, & -18

**April 29, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

L.W. ("Mother")[1] appeals from the juvenile court's order terminating her parental rights to L.W., J.W., M.T., L.P., C.L.Q., and C.Q. (collectively "the Children") contending that the evidence supporting the termination of her parental rights to the Children was insufficient.

We affirm.

## FACTS AND PROCEDURAL HISTORY[2]

The facts most favorable to the juvenile court's decision reveal that Mother has had a history of instability in her life. Mother's father, who has been in prison since 2007, was an alcoholic and physically abused Mother's mother. Mother was molested by an uncle when she was seven years old. She has not been employed since 2005 and, before her incarceration, was receiving public assistance benefits.

The child in need of services ("CHINS") case with respect to the Children arose due to, among other things, serious, unexplained injuries to C.L.Q., ultimately resulting in Mother's incarceration. In total, Mother had seven children by five different men, several of whom were described as being abusive or involved with illegal drug activity. The CHINS case was based on allegations of lack of supervision, physical abuse, and

---

[1] C.Q. ("the Father"), the biological father of C.Q. and C.L.Q., voluntarily terminated his parental rights to those children and does not participate in this appeal. C.P., M.T., and J.W., were alleged to be the biological fathers of certain of the other children who are the subject of this appeal, but failed to appear at the termination hearing, and do not participate in this appeal. Accordingly, we will recite facts pertinent to Mother's appeal.

[2] The record on appeal in this case was prepared pursuant to the Indiana Supreme Court's "Order Establishing the Indiana Court Reporting Pilot Project for Exploring the Use of an Audio/Visual Record on Appeal [,]" issued on September 18, 2012, and effective on July 1, 2012. *See In Re Pilot Project For Audio/Visual Recordings In Lieu of Paper Transcripts In the Preparation of the Record and Briefing on Appeal*, 976 N.E.2d 1218 (Ind. 2012). We are grateful for the cooperation of the Honorable Faith H. Graham of Tippecanoe Superior Court, appellant's counsel, and the Office of the Indiana Attorney General in the execution of this pilot project. Because there is no paper transcript, our citations reflect the location of the information on the DVD.

medical neglect.  The Tippecanoe County Child Protective Services ("TCCPS") received a report that Mother had left her two-month-old twins, C.Q. and C.L.Q., home alone. Because of the support offered to Mother by family members, however, this report was unsubstantiated, and no services were offered to Mother at that time.

On December 7, 2011, the TCCPS received a second report alleging that one of the twins, C.L.Q, arrived at the emergency room with swelling on his face, for which Mother had no explanation.  Mother had provided inconsistent information about C.L.Q.'s caregivers and the onset of his injury.  The CHINS case was then filed.

Concluding that the Children were CHINS, the juvenile court found that the six-month-old child, C.L.Q., had suffered non-accidental trauma consisting of acute soft tissue injuries to the face, extensive acute skull fractures, and intracranial hemorrhages with associated brain injuries.  Those injuries to C.L.Q. were consistent with abusive head trauma consisting of compression forces or crush injury and were equivalent to injuries observed in children run over by motor vehicles.  As a result of C.L.Q.'s injuries, he suffered from seizure disorder, blood loss anemia, right-sided paresis, with other motor function difficulties, as well as ongoing health and developmental risks.

Mother stated that she had noticed C.L.Q.'s symptoms, described as a big head and shaking arms and legs, but failed to seek immediate medical attention.  Mother was the only caregiver at the time, but could not provide a reasonable explanation for the injuries. The injuries suffered by C.L.Q. were made worse by Mother's delay in seeking medical attention.

Mother admitted to leaving the twins home alone while she went shopping, claiming that it was easier and quicker for her than if she had taken them along.  Mother

3

failed to properly supervise her children, allowing the infant twins to fall out of bed on more than one occasion, and had left the twins home alone on more than one occasion.

Mother also admitted to having a sexual encounter with the Father on December 6, 2011, while one of her children was on the same mattress. Mother believed that Father may have harmed that child. Nevertheless, Mother maintained a relationship with Father and became pregnant with another child who is the subject of another appeal before this court. *See In re C.W. v. Ind. Dep't of Child Servs.*, No. 79A04-1310-JT-510 (Ind. Ct. App. ___,___).

Mother's home lacked adequate food and furnishings, and at the time of her children's removal, there was only one half-gallon of milk in the home. The Children did not have beds. None of the fathers had had substantial contact with their children and had not provided financial support. Pursuant to a CHINS detention hearing order issued on December 9, 2011, the Children were placed in protective custody.

Mother was offered services through the CHINS case, but failed to make any progress toward stability or improved parenting. After a year of participation in services offered to her, Mother's visitation with the Children remained fully supervised and occurred only one time per week. Mother was rarely prepared for visits, failing to bring adequate supplies for the Children.

Mother was charged on November 1, 2012, with neglect of a dependent resulting in serious bodily injury, as a Class B felony. Mother pleaded guilty to that charge on April 24, 2013. Conviction was entered on May 31, 2013, and Mother was sentenced to incarceration for ten years, with seven years executed—four at the Department of Correction and three on Community Corrections—followed by three years of supervised

4

probation. At sentencing, the trial court found Mother's lack of remorse and the extensive injuries to C.L.Q. as aggravating circumstances.

One of the Children was reunited with his father, and the CHINS proceedings with respect to that child were dismissed. Mother's parental rights to the other children were terminated on July 26, 2013. Mother gave birth to another child on November 20, 2012, while she was incarcerated at the Tippecanoe County Jail on charges of neglect of a dependent causing serious bodily injury with respect to C.L.Q. Mother reported that the child's biological father could be one of several men. During her incarceration, Mother received notice that she would be evicted from her residence on December 16, 2012. Her bond was set at $12,500 surety, which Mother was unable to produce.

On November 26, 2012, the Tippecanoe County Department of Child Services ("TCDCS") filed a CHINS petition ("the second CHINS case") pertaining to the child born on November 20, 2012. That child was placed in protective custody on the same date, and the court appointed special advocate ("CASA"), who was assigned to represent the best interests of the Children, was assigned to represent the best interests of that child as well.

The CASA has visited Mother at least once per month during Mother's incarceration. The CASA observed that the main concerns Mother expressed were that no one in her family had helped her to get out of jail, that incarceration was difficult for her, and that she did not know what would happen to the possessions she had at her apartment. Mother would occasionally ask about the Children, but would then focus on herself again. A case manager asked Mother if she could see an ultrasound picture of the

5

baby she was carrying. Mother replied that the baby was ugly and had big bug eyes, so she threw the picture away. *DCS Ex. 4* at 49.

The CASA noted that prior to Mother's incarceration, Mother did not have other responsibilities, but could not provide meals consistently for the Children, claiming to have time to cook for them only on the weekends. Mother showed no emotional attachment to her children and placed her own needs before those of her children. The CASA believed that Mother could not provide for her children's needs when she could not take care of herself, and that the children's lives had been unstable for long enough. The CASA recommended the termination of Mother's parental rights to the Children. She noted that at the time of their removal, the Children were malnourished and filthy. One or more of the Children were behind educationally. Although several of the children displayed special needs, all of the Children were deemed adoptable.

TCDCS filed petitions to terminate Mother's parental rights to the Children. The juvenile court held an evidentiary hearing on May 22, 2013 and on June 21, 2013 on those petitions before taking the matter under advisement. On June 26, 2013, the juvenile court entered its order terminating Mother's parental rights to the Children. Mother now appeals. Additional facts will be supplied as necessary.

### DISCUSSION AND DECISION

We begin our review by acknowledging that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider

6

only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

Here, in terminating Mother's parental rights to the Child, the trial court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *L.S.*, 717 N.E.2d at 208.

The "traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *K.S.*, 750 N.E.2d at 836.

Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis supplied).

When a juvenile court decides the issue whether the conditions that led to the Child's removal would be remedied, the juvenile court must assess a parent's fitness to care for his or her child at the time of the termination hearing. *In re D.D. v. Marion Cnty. Office of Family & Children*, 804 N.E.2d 258, 266 (Ind. Ct. App. 2004). Parental rights may be terminated when parties are unwilling or unable to meet their parental responsibilities. *Id.* at 265.

The evidence reflects that Mother remained incarcerated at the time of the termination hearing and was expected to remain incarcerated through most of 2014. Mother had a history of unstable relationships with men who were abusive and/or involved

8

in illegal drugs. Mother's seven children were fathered by five different men, and Mother admitted to having a sexual encounter with the father of two of her children while one of her children was on the same mattress. Mother believed that he may have harmed C.L.Q.

At the termination hearing, TCDCS presented evidence of Mother's participation in services, evidence of Mother's efforts to achieve employment, financial stability, and housing, visitation, and individual counseling. Mother had approximately ten to eleven months during which she was offered services prior to her incarceration in November 2012. Mother does not challenge the juvenile court's findings of fact, but challenges four of the legal conclusions drawn from those facts.

After missing three scheduled appointments for a bio-psychological assessment to evaluate her mental health, Mother attended an assessment on January 28, 2012. During that assessment, Mother disclosed that her father was an alcoholic who physically abused Mother's mother. Mother had received a certificate for completion of a medical assistant program, but never received her license or pursued a career in that field. In her adult life, Mother has worked only six months, serving as a security guard. Mother's employment was terminated when she fell asleep during the graveyard shift. Mother had numerous relationships with the various fathers of the Children, and some of those men physically abused Mother, used drugs, dealt drugs, and denied paternity of the Children. The only time Mother had available to cook for the Children was on the weekends. J.W. and L.P. did not perform well at school and were failing. Mother stated that she trusted the Children to let her know if they needed help with their homework. Mother could not identify areas of parenting in which she might need to improve. Mother had been hospitalized toward the end of 2001 because she heard voices in head and was depressed. The evaluator

9

recommended that Mother participate in individual counseling, case management, supervised visitations, parenting classes, and a psychological evaluation for possible mental-health issues.

Home-based case management and visitation services were provided to Mother by Child and Family Partners. She completed a parenting assessment, which consisted of testing, observations of the family, and additional information. Mother's test results indicated that she did not have the appropriate emotional and practical support to care for the Children. Mother did not feel involved with the Children and had very high and concerning stress levels about her parenting. Mother's overall life stress was extremely high. She perceived that the Children did not meet her expectations and were overly demanding. Mother did not feel comfortable in her role as a parent and lacked nurturing skills. She expected the Children to make life better and to be strictly obedient to her demands. Mother struggled to use means other than corporal punishment in the discipline of the Children. Mother may have answered questions on one of her tests in a fashion that portrayed herself in a more favorable light. That test was deemed invalid.

On April 11, 2012, Mother completed a psychological evaluation, which revealed that Mother had several cognitive challenges and that her intelligence was below average. Concerns about her judgment and decision making were identified as a result. Mother was diagnosed with Borderline Intellectual Functioning, and it was determined that she would struggle in meeting the challenges of raising the Children. Mother was referred to individual therapy for improvement of her coping and decision-making skills.

Mother's participation in case management services through Child and Family Partners began on December 16, 2011. The goals of those services were to assist Mother

10

in finding employment, maintaining a budget, maintain her then-current housing, and to obtain transportation. Mother was also encouraged to improve in her parenting skills, learn about nutrition for the Children and changing diapers. Although services were offered to her to help her achieve those goals, Mother never applied the skills she learned during visitation with the Children.

Mother never found a job, even though she was aware that she needed a job to provide a source of income for the Children. Mother testified at the termination hearing that she was not really looking too hard for a job. (A/V Rec. No. 1; 05/22/2013; 11:54:56-11:55:10). Mother's case manager testified that even though Mother had been supplied with an email account so that she could apply for jobs online, she had applied for approximately five jobs. (A/V Rec. No. 1; 05//22/2013; 10:49:48-10:51:30). Mother told her case manager that she was lazy and did not want to walk to the nearby businesses to apply for work. (A/V Rec. No. 1; 05/22/2013; 10:51:43-10:52:53). Mother also stated that she had a lot going on, even though she also testified that she had only twelve hours-worth of services to attend each week. (A/V Rec. No. 1; 05/22/2013; 11:25:55-11:27:05, 11:29:27-11:30:43). Mother also stated her belief that no one would hire her because she was pregnant with C.W. *DCS Ex*. 4 at 48-55.

Service providers found addressing Mother's budgeting issues challenging in light of the fact that she did not have a job. However, Mother received $1,100 in food stamps each month. Mother would receive the food stamps at the beginning of the month and quickly spend them. Mother also received $1,200 from her mother in February 2012, but instead of paying her $400 electric bill to restore electricity in her home, she spent the money on a bus pass, cab fare, a portion of the electric bill, clothing for herself, restaurants,

and trips to Chicago. *DCS Ex.* 4 at 9-16; (A/V Rec. No. 1; 05/22/2013; 11:06:55-11:08:07).

Mother told her case manager that she did not pay for her electric bill out of her own pocket

because there were community resources to pay it for her. *DCS Ex.* 4 at 11.

Mother also had difficulty managing the minutes on her phone plan and would use

them up at the beginning of the month. Potential employers and service providers had

difficulty contacting Mother because of this. Mother's difficulties making financial

decisions persisted throughout the provision of services. Mother viewed the impending

birth of C.W. as an opportunity to receive State assistance as a source of income. Mother

hoped that the child would not be removed from her care and mentioned traveling to

Chicago for C.W.'s birth.

Additionally, Mother experienced difficulty obtaining a bus pass in order to receive

services and attend scheduled visitation with the Children. She received $34 per month

from her apartment complex to apply toward the payment of bills. Her case manager

suggested that she apply that money for a monthly bus pass. Instead of following that

advice, Mother used the money to travel by taxi, which cost significantly more than a bus

pass would have cost. Consequently, Mother was unable to resolve or manage her

transportation issues.

Mother's home was a three-bedroom townhome located in Section 8[3] housing.

When the Children were removed from Mother's care, she could not maintain the home,

and she was moved to a one-bedroom apartment in the same complex. In September 2012,

Mother reported that she was facing eviction because she had failed to pay the $21 deposit

---

[3] Section 8 Tenant-Based Assistance: Housing Choice Voucher Program. 24 C.F.R. §982.1 *et seq.*

on her current apartment.

Approximately a month before Mother's arrest, Mother's case manager reported that Mother had made no progress during the CHINS case and that Mother seemed unable to comprehend the effects of her actions. Parenting lessons were ineffective because Mother did not apply things she was taught during visitations with the Children.

Mother began her supervised visitations with the Children on December 16, 2011. Two facilitators were present at each visit, which were usually two visits per week. One visit was with the twins only, and the other visit was with all of the Children. On several occasions, Mother canceled visits because she lacked transportation or failed to bring appropriate supplies, such as formula, diapers, and wipes. In particular, on January 24, 2012, Mother was late to her visit with the twins, so the visit was canceled. When Mother missed two visits in February 2012, Child and Family Partners implemented a policy that Mother show up to the visits an hour early before the Children were transported. On March 2, 2012, Mother missed the visit because she failed to show up. Mother also had a visit in March end early and a visit in May canceled because she did not bring enough supplies, such as diapers and wipes. Three other visits were canceled, and Mother failed to show up for two others.

Mother was aware that she could obtain diapers, wipes, and formula for free. At some visits Mother did not provide enough food for the Children, bringing mainly snack items instead of meals. Even though there was not enough food for the Children, Mother would sometimes eat the food during visits.

During the visits that took place, Mother was not engaged with the Children, choosing to sit on the couch and talk at them. The visits were described as very chaotic.

13

When the Children would have behavioral issues, Mother was unable to control their behavior. J.W. was very angry during the visits and there were many outbursts between the Children. During the October 2012 visits, when J.W. would have behavioral outbursts, Mother would yell at and disparage him, rather than try to determine what was wrong. Mother would sometimes make negative comments to the Children and would belittle J.W. or blame him for things. Mother lacked emotional support for the Children and never encouraged the Children to behave despite being told by a service provider that she should do so.

At the request of the case managers, Mother visits with the Children were decreased in mid-October because the Children fought, and J.W., in particular, was having a difficult time at the visits. Mother never requested more visits or protested when they were reduced. Instead, Mother was anxious to leave toward the end of visits and on a few occasions inquired when the visits were going to end. On other occasions, Mother would quickly leave as soon as the visit was over without telling the Children goodbye or hugging and kissing them. Mother made no improvement during the visits with the Children, and her participation declined toward the end.

In June of 2012, Mother missed two individual-counseling visits, complaining about issues with payment for transportation. Mother's counseling sessions were then moved to Mother's home. In July of 2012, the treatment goals were aimed at assisting Mother to prioritize and problem solve. The treatment goals eventually shifted to addressing issues with Mother's self-esteem. In September 2012, Mother failed to engage in this service so no sessions were held. In October 2012, the focus of the individual-counselling sessions changed, with the counselor acting in a supportive role for Mother. Those session were

14

increased to occur bi-weekly. Out of the two sessions scheduled in October, however, Mother attended only one. During that session, Mother acknowledged that she needed change in her life, but was unable or unwilling to identify how to bring about that change.

Some of the Children struggle with behavior issues. J.W. struggles with anger issues and has received some counseling, which has helped him to calm himself down. M.T. has demonstrated food issues including food hoarding. L.W. is very quiet and introverted. M.T. has completed a comprehensive trauma-informed psychological and behavioral risk evaluation which indicated that she has a low level of cognitive function and attachment challenges largely attributable to years of instability and adverse childhood experiences. The assessment further indicated that her cognitive function is likely to improve if she is provided a stable, supportive environment. That improvement was unlikely to happen if placed in an unstructured and unsupportive environment. C.Q. and C.L.Q. each require at least two appointments per day of occupational, physical, or speech therapies.

After their removal from Mother's care, the Children were split up and placed in two separate foster homes. Later, on January 3, 2013, the juvenile court ordered placement of L.W., J.W., M.T., and L.P. with their maternal grandmother, who lived in Chicago, Illinois. The twins were placed in the same foster home and have remained there since that time. The older children have some contact with the twins, but the maternal grandmother has frequently canceled visits between them.

TCDCS Family Case Manager Tracy Williams ("FCM Williams") testified that continuation of the parent-child relationship posed a threat to the Children's physical and mental well-being because Mother was unable to parent and there are no services available

15

that will enable her to do so, Mother has failed to provide adequate supervision to the Children leading to emotional problems for M.T., Mother is unable to transport the Children to their needed appointments, and she lacks a strong bond with the Children. FCM Williams further testified that termination of Mother's parental rights to her children is in their best interest because Mother cannot meet the Children's basic needs of food, clothing, and shelter.

CASA Angela Wilhoite testified that Mother has not remedied the reasons for the Children's removal and was unlikely to do so. The CASA further testified that termination of parental rights was in the Children's best interest and that the continuation of the relationship posed a threat to the Children's physical and emotional well-being. The CASA stated that because Mother had struggled to meet her own basic needs, she will not be able to maintain the basic needs of the Children, demonstrated by Mother having made no changes since the beginning of the case.

The TCDCS's plan for the Children is adoption. The maternal grandmother indicated a willingness to adopt all six of the Children, and the foster parents have indicated a willingness to adopt the twin children. TCDCS took the position that it would be more appropriate for the maternal grandmother to adopt the four older children. Since the twins do not really know their maternal grandmother, TCDCS took the position that adoption of them by the foster parents would be more appropriate. The CASA testified that in her opinion TCDCS's plan was a satisfactory plan.

Mother concedes that the facts most favorable to the juvenile court's judgment terminating Mother's parental rights are contained in the juvenile court's order. Nonetheless, she asks this court to consider additional facts. Those additional facts pertain

16

to the plan for the adoption of the Children and point to the success maternal grandmother is having with the grandchildren placed in her care. The conclusion suggested by Mother's additional facts is that maternal grandmother should have been allowed to adopt all of the Children including the twins. However, those additional facts were before the juvenile court. Thus, Mother's argument is a request for us to reweigh the evidence on this point, a task we are forbidden to undertake on review. *See In re D.D.*, 804 N.E.2d at 265.

Mother challenges the juvenile court's conclusion that there is a reasonable probability that the conditions that resulted in the Children's removal or the reasons for placement outside the home of the parents will not be remedied. Mother argues that in light of her potential November 2014 release date, the juvenile court's decision was premature. She contends that the juvenile court should have given Mother time after her release to establish that she was capable of remedying those conditions.

We have already set forth the factual findings in great detail above. The record demonstrates that Mother did not appear to understand her parental responsibilities. She admitted to leaving her infant twins home alone while she went shopping, because it made the task quicker and easier. Mother's home lacked adequate food and furnishings. When the children were removed from Mother's home, there was only one half-gallon of milk in the home. Mother was offered services as part of the CHINS case. Mother lacked motivation to accomplish the goals set for her and focused on matters other than her children. Mother failed to make any progress toward stability or improvements in her parenting skills. A year after the CHINS case was filed, Mother's visitation with the Children remained fully supervised and occurred only one time per week. Mother was rarely prepared for those visits.

17

In order to establish this statutory requirement, the TCDCS was required to prove only that there is a reasonable probability that Mother's behavior will not change, and need not rule out all possibilities of change. *In re Kay L. v. Johnson Cnty. Dep't of Child Servs.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). The juvenile court may consider a parent's response or lack thereof, to services offered to the parent. *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007). The juvenile court's conclusion is supported by sufficient evidence.

The juvenile court also found that there was a reasonable probability that continuation of the parent-child relationship posed a threat to the Children's well-being. A juvenile court need not wait until a child is irreversibly influenced by a deficient lifestyle such that the child's physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. *In re E.S. v. Miami Cnty. Div. of Family & Children*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). "When the evidence shows that the emotional and physical development of the child in need of services is threatened, termination of the parent-child relationship is appropriate." *Id*.

Here, the factual findings set forth above show by clear and convincing evidence that Mother displayed a continuing lack of stability, neglected at least one of her children's medical needs, and lacked progress in the services provided to her. The family case manager testified that Mother cannot meet the Children's basic needs of food, clothing, and shelter, and that such would pose a threat to the Children's well-being. The CASA stated that because Mother had struggled to meet her own basic needs, she will not be able to maintain the basic needs of the Children, demonstrated by Mother having made no changes since the beginning of the case. We have acknowledged that when a parent fails

to provide stability, neglects a child's medical needs, lacks progress in services, and/or is unable to provide a nurturing relationship to the benefit of the child's needs, this statutory requirement has been proven by clear and convincing evidence. *See, e.g.*, *In re A.S. v. Tippecanoe Cnty. Div. of Child Servs.*, 905 N.E.2d 47, 51 (Ind. Ct. App. 2009); *Matter of Y.D.R. v. Harrison Cnty. Welfare Dep't.*, 567 N.E.2d 872, 877 (Ind. Ct. App. 1991). The juvenile court's conclusion is supported by sufficient evidence.

Mother also challenges the juvenile court's conclusion that termination of parental rights is in the best interests of the Children and that TCDCS had a satisfactory plan for the Children. In sum, Mother argues that because the plan for maternal grandmother to adopt some of the Children and the foster parents to adopt the twins would result in a separation of the Children that the plan is not in their best interests. Mother suggested that a guardianship would allow the Children to remain in contact with each other, which would be in their best interest.

Because Mother has no legal authority to support her position, her argument is waived. Ind. Appellate Rule 46(A)(8)(a) (contentions must be supported by citation to authority). Waiver notwithstanding, Mother's argument fails. A satisfactory plan for the care and treatment of the Children "need not be detailed, so long as it offers a general sense of the direction in which the child[ren] will be going after the parent-child relationship is terminated." *See In re D.D.*, 804 N.E.2d at 268. "Attempting to find suitable parents to adopt the children is clearly a satisfactory plan." *Lang*, 861 N.E.2d at 375. We have also held that the absence of a specific family in place to adopt the children does not render the plan unsatisfactory. *In re B.D.J.*, 728 N.E.2d 195, 204 (Ind. Ct. App. 2000). Here, there were specific, named families in place who intended to adopt the Children. Mother's has

19

failed to establish that the TCDCS's plan was unsatisfactory.

Turning again to the Children's best interests, the record is clear that the Children needed stability and a sense of permanency in order to foster their physical, mental, and social growth. The juvenile court's decision to proceed with termination of Mother's parental rights and for the adoption of the Children is supported by clear and convincing evidence.

We will reverse a termination of parental rights "only upon a showing of 'clear error'--that which leaves us with a definite and firm conviction that a mistake has been made." *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *In re Egly*, 592 N.E.2d 1232, 1235 (Ind. 1992)). Based on the record before us, we cannot say that the juvenile court's termination of Mother's parental rights to the Children was clearly erroneous. We therefore affirm the juvenile court's judgment.

Affirmed.

MAY, J., and BRADFORD, J., concur.