In the Matter of the Involuntary Termination of the Parent–Child Relationship of A.I.,

Jennifer Inkenhaus, Mother and Alan Inkenhaus, Father, Appellants–Respondents,

v.

Vanderburgh County Office of Family and Children, Appellee–Petitioner.

No. 82A01–0404–JV–184.

Court of Appeals of Indiana.

Feb. 24, 2005.

Publication Ordered March 31, 2005.

Transfer Denied June 1, 2005.

Matthew Jon McGovern, Evansville, IN, Attorney for Appellant, Jennifer Inkenhaus.

Jeffery L. Lantz, Evansville, IN, Attorney for Appellant, Alan Inkenhaus.

Katharine Vanost Jones, Evansville, IN, Attorney for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Jennifer and Alan Inkenhaus separately appeal the termination of their parental rights as to their daughter, A.I. We affirm.

### Issues

The parties raise numerous issues in their briefs, which we consolidate and restate as:

I. whether several of the trial court's findings are clearly erroneous; and

II. whether the parties were denied procedural and substantive due process rights as guaranteed by the Fourteenth Amendment.

### Facts

On April 3, 2002, the Vanderburgh County Office of Family and Children ("OFC") received a referral alleging A.I. was in danger of being molested by Alan based on a claim by another one of his daughters who did not live with the parties. The case was assigned to Susan Wilke in the OFC, who identified the problems in the household as substance abuse, domestic violence, and basic parenting and safety issues. Wilke put into place a plan pursuant to which Alan was to leave the home and A.I. would remain with Jennifer pending an investigation.

On April 16, 2002, Wilke went to the home. Alan was present, and Jennifer had a large bruise on her head. Wilke referred her to the local battered women's shelter and to a domestic abuse program, but Jennifer did not follow through on the advice.

Thereafter, Wilke requested detention for A.I. The trial court found probable cause and authorized A.I. to be placed in foster care on April 18, 2002, pending Alan's departure from the premises. The trial court set the matter for an initial hearing on April 24, 2002. On that day, the parents appeared with counsel and were advised of their rights. They denied the allegations in the petition, and the trial court set a trial date. The trial court also issued a no contact order in favor of Jennifer and A.I. against Alan. He was ordered to move from the premises within a month, and A.I. was returned to Jennifer's care as of that date.

A few days later, Wilke talked to Jennifer, who admitted that Alan had been abusing her. Alan continued to have contact with Jennifer and A.I. in violation of the no-contact order.

In June 2002, Jennifer and A.I. were evicted from the residence. Alan found them staying with friends and abused Jennifer. As a result, he was arrested. He later pled guilty to a Class A misdemeanor.

The OFC filed an information for contempt ("IC") alleging a violation of the no contact order. After the parties submitted the matter on the record, the trial court found A.I. to be a child in need of services ("CHINS") and reaffirmed the no-contact order, which specified that Alan was to have no contact with Jennifer or A.I. Within an hour, Alan phoned Jennifer where she was staying and told her he was coming over.

As of July 11, 2002, Jennifer was homeless and had not made any progress on the issues identified by the OFC. The next day, the OFC filed a motion for change of placement and requested detention of A.I. The trial court granted temporary placement and set a hearing on July 17, 2002.

By agreement, the matter was reset for August 2, 2002, and was later continued to August 7, 2002. At that time, the no contact order was amended to permit contact between Alan and Jennifer.

A month later, the trial court conducted the dispositional hearing. The trial court found that A.I. was a CHINS and that placement out of the home was in her best interests. Both parents agreed to a parental participation plan ("PPP") with which the trial court ordered them to comply. Jennifer's PPP required her to:

engage in reasonable efforts in the best interest of the child, including:

(a) obtain assistance in fulfilling obligations as a parent/legal guardian/custodian, to wit: (1) attend and successfully complete Caretakers of Sexually Abused Children Therapy Group; (2) complete a psychological evaluation and follow the recommendations; (3) continue psychotropic medications as prescribed; (4) complete a substance abuse evaluation and follow the recommendations; (5) attend therapy for Victims of Domestic Violence and that will help your family establish appropriate sexual boundaries in your home; (6) attend and successfully complete parenting classes; (7) attend family therapy if the family intends to reunify and follow the recommendations; (8) complete a psychiatric evaluation for medication; (9) submit to random drug screens and breathalyzers.

(b) provide specified care, treatment or supervision for the child, to wit: (1) [removed][ [1] ]; (2) provide routine emergency medical care for the child; (3) ensure that the child is evaluated by the First Steps Program; (4) provide a safe nurturing environment free from domestic violence; (5) devise a safety plan with a therapist that will protect the child from domestic violence and sexual abuse and file the safety plan with the court prior to reunification; (6) abide by the safety plan.

(c) work with any person providing care, treatment, or rehabilitation for the child, to wit: (1) cooperate with the Family Case Manager, In–Home Therapist, Parent Aide, Ireland visitation staff, First Steps Providers, and any other service providers assigned to this case; (2) allow announced and unannounced visits from the Family Case Manager, Parent Aide and In–Home Therapist.

(d) be further ordered to: (1) sign and keep current all Releases of Information including, but not limited to Vanderburgh County Juvenile Court and Vanderburgh County Office of Family & Children and all service providers; (2) contact the Family Case Manager within 48 hours of any change in address, employment, household situation, telephone number, (3) pay for recommended services; (4) pay court-ordered child support; (5) obtain and maintain employment or source of income; (6) obtain and maintain suitable housing; (7) visit as arranged by the Family Case Manager.

Alan's App. pp. 26–27. Alan's plan provided that he:

should engage in reasonable efforts in the best interest of the child, including:

(a) obtain assistance in fulfilling obligations as a parent/legal guardian/custodian, to wit: (1) complete a psychological evaluation including the

---

1. This provision originally stated that she was to "abide by the no-contact order issued on 04/24/2002 between Allen Inkenhaus and [A.I.]." Alan's App. p. 26.

Indiana Sex Problem Scale and follow the recommendations; (3) attend Sex Offender Treatment Group and follow their recommendations; (4) attend and successfully complete Domestic Violence Treatment; (5) attend and successfully complete parenting classes; (6) attend therapy to establish appropriate sexual boundaries; (7) attend family therapy if the family intends to reunify and follow the recommendations; (8) submit to random drug screens and breathalyzers if a screen returns positive, complete a substance abuse evaluation and follow all treatment recommendations.

(b) provide specified care, treatment or supervision for the child, to wit: (1) abide by the no-contact order issued on 4/24/2002 between Allen Inkenhaus and [A.I.]; (2) provide routine emergency medical care for the child; (3) ensure that the child is evaluated by the First Steps Program; (4) provide a safe nurturing environment free from domestic violence; (5) devise a safety plan with a therapist that will protect the child from domestic violence and sexual abuse and file the safety plan with the court prior to reunification; (6) abide by the safety plan; (7) refrain from bathing [A.I.]; (8) refrain from changing [A.I.]'s diapers or providing any personal care; (9) refrain from any form of sexual or intimate contact with [A.I.].

(c) work with any person providing care, treatment, or rehabilitation for the child, to wit: (1) cooperate with the Family Case Manager, In–Home therapist, Parent Aide and First Steps Providers and any other service providers assigned to this case; (2) allow announced and unannounced visits from the Family Case Manager, Parent Aide and In–Home Therapist.

(d) be further ordered to: (1) sign and keep current all Releases of Information including, but not limited to Vanderburgh County Juvenile Court and Vanderburgh County Office of Family & Children and all service providers; (2) contact the Family Case Manager within 48 hours of any change in address, employment, household situation, telephone number, (3) pay for recommended services; (4) pay court ordered child support; (5) obtain and maintain employment or source of income; (6) obtain and maintain suitable housing; (7) visit as arranged by the Family Case Manager.

Alan's App. pp. 29–30. The trial court ordered both parents to pay weekly support for A.I. beginning September 27, 2002.

On September 6, 2002, the trial court conducted a hearing on the IC. Alan admitted that he was in contempt.

After several continuances, the trial court eventually conducted a review and permanency hearing on April 9, 2003. The review memorandum contains the OFC's concerns that both parents were abusing prescription medications; both refused to sign releases; no support had been paid; domestic conflict continued; and Jennifer reported she could not protect A.I. from Alan. The trial court found that A.I. remained in need of services and continued the dispositional decree.

Thereafter, the OFC filed an IC against Jennifer alleging that she had failed to cooperate with the therapist, OFC, and other service providers; obtain employment and create a safe environment for A.I.; and failed to attend Caretakers of Sexually Abused Children. An IC against Alan was also filed, alleging a failure to cooperate with the in-home therapist and

to attend and successfully complete Care-takers of Sexually Abused Children.

The parties were advised of their rights and counsel was appointed. The trial court set a hearing on the ICs for May 15, 2003. On that date, the parties and counsel appeared. The trial court ordered Jennifer into inpatient treatment at Stepping Stone, a substance abuse center, and ordered Alan not to interfere. The IC was continued for progress until July 23, 2003, when the parents failed to appear and the IC was reset to August 6, 3003. On August 4, 2003, the OFC filed an amended IC alleging that Alan failed to sign releases or provide breathalyzers; gave false information during substance abuse evaluation; failed to pay child support; and failed to maintain employment/or source of income.

On August 6, 2003, the trial court conducted a hearing on the petition for the termination of parental rights that had been filed on May 30, 2003. The parties appeared and were advised of their rights. The trial court appointed a court appointed special advocate ("CASA"). The trial court set the matter for trial beginning November 20, 2003. The trial court also found Alan in contempt and sentenced him to a suspended sentence.

In September 2003, the trial court conducted a review hearing. The parties were homeless and refused to inform the OFC where they were residing or maintain contact with the OFC; neither party had paid child support for A.I.; Alan tested positive for Methadone and prescription drugs; Jennifer had failed to follow through with her treatment at Stepping Stone; and the parties were not visiting A.I. The trial court continued placement in foster care.

After the trial commencing in November, the trial court terminated the parties' respective parental rights. In its order, the trial court stated in relevant part:

4. The Court now finds by clear and convincing evidence that the allegations of the petition are true in that:

a. The child has been removed from her parents for a[t] least six (6) months pursuant to a dispositional decree; specifically from July 17, 2002 to the present.

b. There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for the placement outside the parent's home will not be remedied. As the Court finds that both parents have a history of abusing prescription drugs and other illegal controlled substances, that the parents['] marriage has times of discord and domestic violence, that the parents are transient and put their own interest before the child's, as they continue to not support the child or make any significant changes on behalf of the child.

c. The continuation of the parent-child relationship poses a threat to the well-being of the child; and that it is in the best interest for the safety and welfare of the child that the parental rights be terminated;

d. The County Office of Family and Children has a satisfactory plan for the care and treatment of the child, that being adoption.

Alan's App. pp. 5–6. Both parents appeal, raising essentially the same issues.

## Analysis

 "The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct.App.1996), *trans. denied.* However, these parental interests are not absolute and must be subordinate to the child's

interests in determining the proper disposition of a petition to terminate parental rights. *Id.* Parental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct.App.1999), *trans. denied, cert. denied,* 534 U.S. 1161, 122 S.Ct. 1197, 152 L.Ed.2d 136 (2002). The purpose of terminating parental rights is not to punish parents but to protect children. *In re D.D.*, 804 N.E.2d 258, 264–65 (Ind.Ct.App.2004), *trans. denied.*

### I. Trial Court's Findings

■ The parents challenge several of the trial court's findings. In reviewing termination proceedings on appeal, we will neither reweigh the evidence nor assess the credibility of the witnesses. *In re S.P.H.*, 806 N.E.2d 874, 879–80 (Ind.Ct. App.2004). We only consider the evidence that supports the trial court's decision and reasonable inferences drawn therefrom. *Id.* Our standard of review for the trial court's findings of fact and conclusions thereon is two-tiered. *Id.*

■ First, we must determine whether the evidence supports the findings and, second, whether the findings support the conclusions of law. *Id.* In deference to the trial court's unique position to assess the evidence, we set aside the trial court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* A judgment is clearly erroneous only if the conclusions of law drawn by the trial court are not supported by its findings of fact or the conclusions of law do not support the judgment. *Id.*

■ The involuntary termination of parental rights is the most extreme measure that a court can impose and is only desig-

nated as a last resort when all other reasonable efforts have failed. *Id.* This policy is in recognition of the Fourteenth Amendment to the United States Constitution that provides parents with the right to establish a home and raise children. *Id.* However, these protected parental rights are not absolute and must be subordinate to the children's interest to maintain the parent-child relationship. *Id.*

■ Although parental rights have a constitutional dimension, the law allows for their termination when parties are unable or unwilling to meet their responsibility as parents. *Id.* To obtain a termination of the parent-child relationship, the OFC must allege and prove that:

(A) one (1) of the following exists:

(i) the child has been removed from the parent for at least six (6) months under a dispositional decree;

(ii) a court has entered a finding under IC 31–34–21–5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or

(iii) after July 1, 1999, the child has been removed from the parent and has been under the supervision of a county office of family and children for at least fifteen (15) months of the most recent twenty-two (22) months;

(B) there is a reasonable probability that:

(i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or

(ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

Ind.Code § 31–35–2–4(b)(2). The OFC's burden of proof in this respect must be met by clear and convincing evidence. *McBride v. Monroe County Office of Family & Children,* 798 N.E.2d 185, 198 (Ind. Ct.App.2003). The parents challenge several of the trial court's findings. We address each one.

### A. Finding that the Reasons for A.I.'s Removal Would Not Be Remedied

■ The trial court found that the reasons for A.I.'s removal were not likely to be remedied, based on the evidence that both parents had a history of abusing drugs, that their marriage was occasioned by domestic violence, that the parents were transient, and that they put their own interests above those of A.I. Jennifer and Alan argue that the trial court's finding is clearly erroneous because A.I. was not removed for any of the reasons cited in the trial court's findings given that "all of these alleged conditions materialized after A.I. was removed from Jennifer." *Id.*

We addressed a related question in *In re Y.D.R.,* 567 N.E.2d 872, 875 (Ind.Ct. App.1991). In that case, the mother challenged the trial court's finding that the conditions prompting removal of the children would not be remedied on the basis that the children were not residing with her at the time they were originally taken into custody. We found her argument to be without merit and concluded that the phrase "the conditions that resulted in the child's removal" found in the termination statute referred for purposes of termination to removal under a dispositional decree, not the time the child was originally taken into custody. *Id.* at 875.

Similarly, in *In re C.D.,* 614 N.E.2d 591, 593 (Ind.Ct.App.1993), *trans. denied,* the grounds necessitating the emergency detention of the children from the mother's home were not applicable to the father because the children were in her custody. However, we found that further psychological examinations of the children and the father revealed other grounds justifying removal of the children from the father, which grounds were brought out at the CHINS hearing and became a basis of the dispositional decree. *Id.* We concluded that "removal" of the children for purposes of the termination statute was detailed in the dispositional decree. *Id.*

The termination statute has changed since our holdings in *Y.D.R.* and *C.D.* It now provides that the State must establish a reasonable probability that "the conditions that resulted in the child's removal or *the reasons for placement outside the home* of the parents will not be remedied." [2] I.C. § 31–35–2–4(b)(2)(B)(i) (emphasis added). This language clarifies that it is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside of the home. *See In re A.A.C.,* 682 N.E.2d 542, 544 (Ind.Ct.App. 1997) (holding that the proper inquiry was what conditions led to the OFC's retention of custody of the child and whether there was a reasonable probability that those conditions were likely to be remedied).

---

**2.** We note that Alan argues that the trial court "failed to adhere to the strict requirements of the termination statutes I.C. 31–6–5–4(c) *and* 31–6–5–4.3 ...." Alan's Br. p. 11 (emphasis

original). The statutes to which he refers have been repealed and replaced by the current statutory scheme.

Here, the trial court properly considered the conditions leading to the continued placement outside of the home rather than simply focusing on the basis for the initial removal of A.I., namely the allegation of sexual abuse by another one of Alan's daughters. Indeed, the trial court specifically stated that it would not consider the molestation allegations as part of the termination proceedings but rather that it would focus on the continued conduct of the parties with respect to the care of A.I. A new CHINS petition was not required for each additional ground for intervention that was discovered. *See C.D.*, 614 N.E.2d at 593; *Y.D.R.*, 567 N.E.2d at 876. The trial court's finding that the conditions were not likely to be remedied is not clearly erroneous as claimed by the parents.[3]

### B. Finding that Continuation of Relationship Poses a Threat

■ The parties next challenge the trial court's finding that the continuation of A.I.'s relationship with them posed a threat to A.I., arguing that there is insufficient evidence to support it. Jennifer argues that the OFC's failure "to provide evidence of how A.I. evinced the harmful effects of Jennifer's care should mandate a reversal of the trial court's termination judgment." Jennifer's Br. p. 15. Jennifer acknowledges the evidence presented that she has a substance abuse problem, that her addiction has affected her financially to the point where she paid three thousand dollars in one week for drugs and was evicted from her home after spending rent money on drugs, that she is the victim of "occasional domestic violence," that she

questioned her ability to protect A.I. from Alan in the event it was necessary to do so, that she wondered whether Alan had molested his daughter, and that she was concerned A.I. might be hurt if Jennifer and Alan began fighting. Jennifer Br. p. 16. Yet, she claims that none of these factors justify the trial court's judgment. Rather, she argues that the OFC did not present clear and convincing evidence establishing that A.I.'s well-being was threatened by her behavior. In addition, Alan urges us to reverse the termination because there is an absence of specific evidence that the domestic violence and the substance abuse posed a threat to A.I. or rendered the parents unable to care for her.

We do not agree with the parties' assessment of the evidence. There was ample evidence presented to establish that the parties engaged in destructive and dangerous behavior, that the behavior was ongoing without any serious sign of improvement, and that the behavior posed a threat to A.I.

Linda Roth, who counseled Alan, reported that he projected blame on others and externalized responsibility. He attended only half of the sessions before being dismissed from individual therapy. Roth transferred Alan to a group anger management class. In this class, he arrived late, talked on his cell phone, and continuously interrupted while others were talking. He projected blame for the domestic violence onto Jennifer. Roth concluded that although he completed the program, he "learned to say what was expected of

---

**3.** We note that neither parent specifically challenges the evidence supporting the trial court's finding that there was a reasonable probability that the conditions would not be remedied, specifically the trial court's finding that both parents have a history of abusing prescription drugs and other illegal controlled substances, that their marriage has periods of violence, that they are transient and put their own interest before the child's, and that they continue to not support the child or make any significant changes on behalf of the child. As such, we do not reach the question of whether those portions of this finding are supported by the evidence in the context of whether they are likely to be remedied.

him, but I don't think he internalized the process." Tr. p. 210.

Roth further expressed concern during her testimony:

I have several issues of concern. One would be the substance use. I was never able to identify who the treating physician was. He would not indicate a name, not provide releases. The concern for being on OxyContin and Lortab for an extended period was significant. Also, his need for immediate gratification, a need to respond to his impulses and also his ability to assess the situation and then say what he felt needed to be said to look like you were in good standing. So his credibility was suspect because the ultimate follow through and sign in didn't happen.

\* \* \* \* \*

I believe Alan's issues are that of a significant personality disorder. I believe it relates to traits of narcissism, anti-social, and that to deal with them it would take long term structured consequences for each individual act, but yes I think he might respond to treatment on a long term basis.

Tr. pp. 209–10.

Jennifer counseled with Marti Ertel at the Lampion Center. Jennifer reported that she suffered from panic attacks, had been diagnosed as bi-polar, and was very depressed. She disclosed that she was unhappy in her marriage and was a victim of domestic violence. She stated that she wanted to leave Alan but was afraid. She expressed fear of being on her own.

Jennifer told Ertel that she wanted to regain custody of A.I., but that she felt it was not safe for her daughter. She expressed fear to Ertel that if she and Alan were fighting, A.I. would get hurt. She reported that she believed Alan had molested his other daughter and her two sons and felt that she could not protect A.I. if A.I. were returned. Ertel stated, "I always felt it was something she just knew. She just felt that her daughter wouldn't be safe in the home if Alan was there, but that's what she kept repeating to me. That she knew her daughter wouldn't be safe there." Tr. p. 362.

Ertel arranged for a representative of the battered women's shelter to meet with Jennifer. Jennifer agreed to stay at the shelter, but backed out after getting into a fight with Alan when she told him. When asked whether she believed Jennifer would be capable of raising A.I., Ertel answered:

I probably have to question that just because I think parenting skills go just beyond taking care of a child. That's also taking care of yourself financially and being able to hold a job and being able to take care of yourself as well as the child. I think that's part of the big picture of being able to raise a child.

Tr. p. 355. Jennifer was very sporadic in her attendance with therapy. During the period Jennifer counseled with Ertel, the issues remained the same. Jennifer did not obtain employment, showed no signs of independence, and failed to succeed in any of her goals.

Daniel Sommer was an in-home therapist who first visited the home on March 5, 2003. The issues he identified were domestic violence, drug abuse, and general relationship issues. He stated that the parties blamed others for their drug use. Alan complained that Jennifer was "out of control" when she was using Benzodiazepines, but blamed her physician. When Alan tested positive for Methadone, he said that his neighbor must have given him Methadone when he asked for Tylenol.

Sommer testified that it was not until May 2003 that Jennifer admitted a drug problem. She told Sommer that she had

been using since she was fourteen years old. She acknowledged taking Alan's medications and admitted she needed treatment. Sommer offered to drive Jennifer to a substance abuse treatment facility on several occasions, but Alan intervened each time. On three occasions in May 2003, Jennifer signed herself into treatment and then back out of treatment again.

On May 19, 2003, after Jennifer signed herself out of treatment, Sommer went to the house. Alan and Jennifer gave multiple reasons why Jennifer did not complete the treatment. When Sommer told Alan that he was concerned about Jennifer getting the treatment she needed, Alan became visibly angry and demanded Sommer leave the home, getting out of his chair and advancing toward Sommer in an aggressive manner.

On another occasion, Alan because very domineering and disruptive, discouraging Jennifer from going into treatment. Jennifer commented to Sommer, "See what I have to put up with?" Tr. p. 241.

Sommer attempted to help Jennifer find employment, but was thwarted by Alan on each occasion. Sommer's last visit to the home was June 3, 2003. During the period he visited the home, none of the issues had been resolved. Neither Jennifer nor Alan had obtained drug treatment, neither was employed, Alan's domineering behavior continued, and the parties were being evicted from their home due to Jennifer's spending their money to purchase drugs.

Sharon Gillespie is a Parent Aide who supervised visitation, facilitated drug testing, and instructed the parties in basic parenting skills. She began working with the parties in July 2002. She identified drug use, employment, and housing issues. She testified that Alan left the room and did not interact with A.I. during visits. She stated, "[W]hen there's not that much time you get to spend with the child, then your focus should be on the child for the hour or two hours that you're there with the child." Tr. p. 390.

Gillespie also testified that after the parties were evicted in May 2003, they disappeared for weeks at a time. Gillespie testified that she attempted to contact the parties but was unsuccessful. She stated that the parties told her later that they had been living in shelters, hotels, and with friends. She stated that their visitation with A.I. became sporadic. They had no visitation at all from July 15, 2003, until September 25, 2003. Gillespie also testified that the parties were sporadically employed and that neither maintained permanent employment.

In May 2003, Jennifer called Gillespie when she was upset after an argument with Alan. Jennifer had fled after Alan had flung her around the room. Gillespie picked Jennifer up and drove her to the domestic violence shelter. When the shelter refused her admittance because of Jennifer's drug use, Gillespie drove her to a detox facility.

On September 23, 2003, Gillespie saw Jennifer and Alan. When Alan left the room, Jennifer said, "That mother [f* * * * * *] is a psycho." Tr. p. 387. She told Gillespie that Alan had hit her again. Gillespie offered to take Jennifer to an abuse shelter, but Jennifer refused and stated that she did not feel safe from Alan there. Jennifer also told Gillespie that she thought Alan's daughter might have been telling the truth in her molestation allegations.

Dr. Jon Hall, the parties' physician, testified that he received a phone call in June 2001 during which Alan said that Jennifer was "freaking out" and that he was concerned for A.I.'s safety. Tr. p. 299. Dr. Hall further testified that he stopped

treating the family after a few incidents. One of the incidents occurred on August 24, 2001, when Alan called him and stated that he was experiencing withdrawals because he gave some of his medication to Jennifer. Dr. Hall testified that if Alan had been taking his medication as prescribed, then he would not have had withdrawals. Dr. Hall refused to prescribe any more medication for him. The second incident involved Alan getting into altercations in the waiting room. When Dr. Hall refused to treat him, Alan threatened him.

Jennifer's medical records from Southwestern Indiana Mental Health reflect that Jennifer suffered from post-partum depression after A.I.'s birth and that she reported a history of manic depression and a bi-polar disorder. She reported drinking and smoking marijuana from the time she was twelve years old. By age thirteen, she was using crank and drinking alcohol on a daily basis. By age fifteen, she was regularly snorting crank. At age seventeen, Jennifer drank half a fifth of vodka and fifteen beers, snorted one line of crank, and smoked ten marijuana joints per day. She went through withdrawal, experiencing shakes, nervousness, and blackouts. She was unable to control her usage and had given up daily activities.

On June 5, 2001, when A.I. was a year old, Jennifer was referred to a substance abuse treatment facility by Dr. Hall after overdosing on Percocets. At that time, she reported drinking and smoking one or two marijuana joints per day. She also stated that she had begun using cocaine, methamphetamine, and abusing medications when she was twenty years old. She reported that she was getting her narcotics on the street or stealing them from Alan. She reported her longest period of sobriety was six months, but she did not follow up with treatment.

The OFC also referred Jennifer to the substance abuse treatment facility. She checked into the facility three times, but checked herself out without completing the program each time. During one intake in July 2003, Jennifer reported that she had ingested ten Klonopins and smoked two or three marijuana joints that day. One employee of the facility, Casey Bonnewell, believed Jennifer's dependence was at a very high level and probably took years to develop. He told her that she needed intensive treatment and that she would die if she did not quit. Jennifer completed five to seven sessions with Bonnewell, but then discontinued treatment against advice. He recommended that Jennifer enter into a long-term residential care facility where she would be able to reside and focus on her treatment for at least a year without outside interferences. He further stated that there was no possibility that she could get well doing what she was doing. Jennifer stated that the reason she did not follow through with treatment was that she "didn't know how to function without any kind of drugs being by [herself]." Tr. p. 550.

In December 2003, Jennifer became a patient at the Evansville Treatment Center, a methadone clinic. At intake, she reported that she used morphine every day until September 3, 2003. She reported snorting Oxycontin every day since the age of 20. She stated that she had ingested 25–30 Lortabs on December 5, 2003, one of the days of trial. When she arrived at the clinic, she was experiencing withdrawal symptoms. She tested positive for opiates.

During the time the OFC was involved with Jennifer and Alan, they underwent random drug testing through Hi Tech. Alan tested positive for marijuana fourteen times, methadone three times, morphine twice, and prescription medications on nu-

merous occasions. Jennifer tested positive for numerous prescription medications, opiates, methadone, and EDDP.

After reviewing this and the other evidence, it is clear to us that the trial court was within its discretion to find that the continuation of the parent relationship posed a threat to A.I. Although there was no specific testimony that either parent had physically abused A.I., there can be little doubt that the parties' serious substance abuse addictions detrimentally affected or greatly endangered her. The parties' failure to maintain stable employment and housing, as well as the constant drug use and sporadic domestic violence, renders the environment for A.I. destructive at best and dangerous at worst. We need not wait until A.I. suffer permanent psychological or physical injury before intervening. There is evidence to support the trial court's finding.

### C. Finding that Termination is in A.I.'s Best Interest

■■■ The parties next challenge the trial court's finding that termination is in A.I.'s best interest, arguing that there was no particularized evidence to support the finding. Jennifer argues that the "OFC invited the trial court to assume ... that the termination of [her] parental rights would be in A.I.'s best interest on the basis of Jennifer's substance abuse and victimization by occasional domestic violence." Jennifer's Br. p. 20. She points to evidence that A.I. benefited from her relationship with Jennifer and argues that the OFC should be required to show that A.I. has evinced harmful effects of the parent-child relationship.

■■■ We are mindful that in determining what is in the best interests of the children, the court is required to look beyond the factors identified by the OFC and look to the totality of the evidence. McBride, 798 N.E.2d at 203. In so doing,

the trial court must subordinate the interests of the parents to those of the children. Id. We have previously determined that the testimony of a child's guardian ad litem regarding the child's need for permanency supports a finding that termination is in the child's best interests. Id.

Here, the evidence demonstrated that the parents have a history of serious substance abuse and a number of mental health problems. Despite the extensive services offered to them since A.I. was removed, including substance abuse treatment, psychiatric evaluations, psychiatric care, counseling, parenting classes, anger management classes, and others, the parents failed to adequately demonstrate a change in the conditions that necessitated A.I.'s continued removal. Moreover, A.I.'s CASA, Sarah Lee, testified that she thought it was in A.I.'s best interest to terminate parents' rights. The family case manager, David Straw, also testified that he believed it to be in A.I.'s best interest for the rights to be terminated. He stated that as of the date of the final hearing, neither parent could provide permanency for the child and that although both parties voiced a willingness to try to establish a stable environment for A.I., neither had changed his or her behavior to make it happen. Based upon the totality of the evidence, the trial court's finding that termination was in A.I.'s best interest was supported by the evidence. See In re M.M., 733 N.E.2d 6, 13 (Ind.Ct.App.2000) (holding that the testimony of the CASA and the family case manager, coupled with the evidence that the conditions resulting in the placement outside the home will not be remedied, is sufficient to prove by clear and convincing evidence that termination is in a child's best interest).

### II. Due Process Rights

The Fourteenth Amendment to the United States Constitution provides that

"no person shall be deprived of life, liberty, or property without due process of law." As we explained in *A.P. v. Porter County Office of Family & Children*, 734 N.E.2d 1107, 1112 (Ind.Ct.App.2000), *trans. denied:*

> The involuntary termination of parental rights is an extreme measure that is designed to be used only as a last resort when all other reasonable efforts have failed. Choices about marriage, family life, and the upbringing of children are among associational rights the United States Supreme Court has ranked as of basic importance in our society and are rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect. A case involving the State's authority to permanently sever a parent-child bond demands the close consideration the Supreme Court has long required when a family association so undeniably important is at stake.

(citations omitted). Accordingly, a parent's right to raise his or her children is protected by the Due Process Clause. *See McBride*, 798 N.E.2d at 194. Jennifer and Alan argue that they were denied both procedural and substantive due process. We address each argument.

### A. Procedural Due Process

The parties argue that they were denied procedural due process in four ways. First, Jennifer and Alan contend that the OFC failed to comply with its statutory mandate to make reasonable efforts to reunite and preserve the family. Indiana Code Section 31–34–21–5.5 provides:

> (a) In determining the extent to which reasonable efforts to reunify or preserve a family are appropriate under this chapter, the child's health and safety are of paramount concern.

> (b) Except as provided in section 5.6 of this chapter, a county office of family and children shall make reasonable efforts to preserve and reunify families as follows:
>
> (1) If a child has not been removed from the child's home, to prevent or eliminate the need for removing the child from the child's home.
>
> (2) If a child has been removed from the child's home, to make it possible for the child to return safely to the child's home as soon as possible.

They allege that the OFC failed to abide by this statutory mandate. Jennifer claims that the OFC had no intention of reuniting her family and that it encouraged her to leave Alan.

Before the OFC filed a CHINS petition, it devised a plan whereby A.I. would stay in the home and Alan would leave. Alan failed to comply with the plan, and the trial court temporarily placed A.I. outside the home in April 2002. The OFC requested a protective order to remove Alan from the home so that A.I. could return. However, Alan refused to abide by the protective order, and incidents of domestic violence toward Jennifer continued to occur. In July 2002, the trial court ordered that A.I. be placed in foster care.

Furthermore, the OFC offered several services to the parties in an attempt to improve the circumstances to facilitate the reunification of the family. However, the parties failed to complete several of the services, failed to complete drug treatment, and failed to secure steady employment and housing. Jennifer continued to report to her counselor, the parent aide, and caseworkers that Alan was physically abusive to her and that she feared he would hurt A.I. if she were returned. She stated that she believed Alan had sexually molested one of his other daughters and that she feared for A.I.'s safety.

The evidence is clear that the OFC made attempts to reunite A.I. with Jennifer. The OFC only removed her initially when Jennifer continued to allow Alan into the home. Alan's presence posed a threat to the safety and well-being of A.I., and it was appropriate if not required for the OFC to prevent A.I. from being in Alan's care. Furthermore, the OFC made attempts to help the parties improve the circumstances in order for them to regain custody of their daughter after more issues were discovered. It is clear to us that the parties failed to cooperate and failed to make sufficient progress so that there could be a safe return of A.I. to their care. Therefore, we conclude that the OFC made reasonable attempts to reunify the family as required by Indiana Code Section 31–34–21–5.5, and, therefore, we find no due process violation with respect to this argument.

Second, the parties argue that the OFC failed to place them on notice as to what it considered a safe environment for A.I. They acknowledge that they each received and signed a PPP, but argue that the PPPs did not require Jennifer to leave Alan despite the fact that the OFC apparently required her to do so before it would reunite her with A.I. They point to Straw's testimony that Jennifer failed to follow the safety plan that was initially in place and argue that the OFC never developed or helped her develop such a safety plan. They contend that the OFC's failure to provide them with a safety plan or to help them develop a plan that specifically outlined their obligations in preparing a safe environment hampered their ability to satisfy the OFC's demands. This lack of notice, they argue, violated their right to procedural due process.

We find this argument to be without merit. The parents' argument is one of semantics as to what constitutes a "safety plan." The "safety plan" initially in place and referred to by Straw was to have Alan leave the home and have A.I. remain in the home with Jennifer while the OFC could further investigate the molestation charges. However, Alan refused to abide by the plan, even after the trial court issued a no contact order. There is no question that the parties knew and understood that Alan was not to be in the home, and they do not claim otherwise. It is irrelevant whether the original order to have Alan leave was titled a "safety plan." The parties knew Alan was to leave the home, and the parties were aware of the items contained in their PPPs to which they agreed and signed. At no time did the parties request a clarification of the recommendations or services prompted by the OFC. There is no basis for their claim that they lacked notice or were hampered by their ability to comply with the OFC's requirements.

■ Third, Jennifer argues that she was denied due process when the trial court found A.I. to be in need of services before she had an opportunity to answer the petition. According to the docket, the trial court found A.I. to be in need of services on April 24, 2002, before the parents had an opportunity to present evidence or contest the petition. She acknowledges the trial court's subsequent statement that the entry must have been a mistake, but argues that her due process rights were violated because the trial court failed to comply with the requirement set forth in Indiana Code Section 31–34–11–1 that it conduct an evidentiary hearing before finding a child to be in need of services. She further acknowledges that the trial court declared A.I. to be a CHINS a second time on July 3, 2002, after the parents presented evidence. However, she contends she "had no way of knowing that the result was not predetermined as

A.I. was already declared a child in need of services." Jennifer's Br. p. 27.

We conclude that the error in the docket entry was harmless. The trial court did conduct an evidentiary hearing before declaring A.I. to be in need of services. The fact that the docket entry from the initial hearing reflects a finding that A.I. was a CHINS is of no moment given that the trial court recognized the error and conducted an evidentiary hearing during which the parties were heard. There is no evidence that the result was predetermined, as Jennifer suggests. We find no harm resulting from the erroneous docket entry.

■■■ Finally, Jennifer contends that the trial court failed to issue findings and conclusions in its orders removing A.I. from her custody. Indiana Code Section 31–34–19–10 provides:

> The juvenile court shall accompany the court's dispositional decree with written findings and conclusions upon the record concerning the following:
>
> 1. The needs of the child for care, treatment, rehabilitation, or placement.
>
> 2. The need for participation by the parent, guardian, or custodian in the plan of care for the child.
>
> 3. Efforts made, if the child is in need of services, to:
>
> (a) prevent the child's removal from; or
>
> (b) reunite the child with;
>
> the child's parent, guardian, or custodian in accordance with federal law.
>
> 4. Family services that were offered and provided to:
>
> (a) a child in need of services; or
>
> (b) the child's parent, guardian, or custodian in accordance with federal law.
>
> 5. The court's reasons for the disposition.

We have previously determined that a trial court's failure to issue findings to support an original and an amended dispositional decree is a violation of this section. *See* *A.P.,* 734 N.E.2d at 1116.

Jennifer notes that the trial court issued only general findings in its initial order removing A.I. on April 17, 2002, and issued no findings in support of its order removing A.I. a second time on July 12, 2002. However, the trial court held a dispositional hearing in the CHINS case on September 6, 2002. Prior to the hearing, the OFC prepared a predispositional report with assistance and input from Jennifer. Both parents appeared with counsel for the hearing, agreed to the PPPs, and had the opportunity to be heard. After the hearing, the trial court issued the following order:

> Court finds that the child has a special need for care, that there is a need for treatment and rehabilitation; there is a need for participation by the parents which appears to be forthcoming; efforts made to reunite the family have been unsuccessful to date; family services offered and provided have been reasonable; child remains a child in need of services; child is made a ward of Vanderburgh Office of Family and Children with placement [not] with the mother; this placement is in the least restrictive, most appropriate, and in the child's best interest.

Jennifer's App. p. 65. The trial court's order, while sparse, substantially complies with the statutory requirements. It is clear from the order that the trial court considered all the factors set forth in the statute. Therefore, we find no constitutional deficiency with respect to compliance with Indiana Code Section 31–34–19–10

■ We have concluded that none of the examples cited by the parties constitute a violation of their procedural due process rights. However, even if one or more of the examples were found to be procedurally irregular, we would not be obligated to reverse the termination order as a result.

In *A.P.*, 734 N.E.2d at 1111, we reversed the trial court's termination of A.P.'s parents' rights. In doing so, we held that several substantial procedural irregularities during the CHINS and termination proceedings, when taken together, constituted a violation of due process. *Id.* In that case, the Porter County Office of Family and Children ("PCOFC") filed a CHINS petition on behalf of A.P. and his brothers after juvenile court approval for a program of informal adjustment was denied. *Id.* at 1109. This petition did not request that the children be removed from their home. The trial court determined that A.P. and his brothers were CHINS after an initial hearing in which their mother admitted the allegations in the CHINS petition and their father failed to appear because he was incarcerated. The trial court then entered a "Dispositional Hearing Order" that did not remove A.P. and his brothers from their home. *Id.* Next, the juvenile court at a status hearing entered an order that A.P. and his brothers be placed in foster care. *Id.* This order did not include written findings and conflicted with the PCOFCs recommendation that the children not be removed from their home for the time being. *Id.*

After several status and review hearings, the PCOFC filed its first petition to terminate A.P.'s parents' parental rights in January of 1997. The trial court, however, did not take any action on the petition except to continue a hearing date on the petition without setting a new hearing date. *Id.* Then in early 1999, the PCOFC

indicated its desire to reactivate its two-year-old petition to terminate A.P.'s parents' parental rights and a hearing was set for June 1999. Between 1997 and 1999, A.P.'s CHINS proceedings continued and review hearings were held at least every six months but A.P.'s father was incarcerated for most of this time. *Id.* at 1110. The PCOFC then filed another termination petition in which it sought to terminate A.P.'s parents' rights respecting only A.P., unlike the 1997 petition that included A.P.'s brother.

At the termination hearing, A.P.'s parents challenged the authority of the "magistrate pro tem" presiding over the matter and filed a motion to disqualify her as "temporary judge." *Id.* No copy of the order appointing the magistrate pro tem to preside over the hearing was included in the record on appeal. Additionally, the magistrate pro tem herself signed the order denying A.P.'s parents' motion to disqualify her as temporary judge. Lastly, the trial court heard testimony from A.P.'s parents, caseworkers, psychologists, social workers, and the PCOFC before concluding that A.P. had been removed from his parents for more than six months under a dispositional decree, that there was a reasonable probability that the conditions that resulted in his removal would not be remedied, that continuing the parent-child relationship threatened A.P.'s well-being, that termination was in A.P.'s best interests, and there was a satisfactory plan for A.P.'s care and treatment. *Id.* Consequently, the trial court terminated A.P.'s parents' parental rights. *Id.*

On appeal, we explained the relationship between CHINS and termination proceedings:

> [P]rocedural irregularities in a CHINS proceedings may be of such import that they deprive a parent of procedural due process with respect to the termination

of his or her parental rights. It would be incongruous to hold that a county, with the assistance of a juvenile court, may commence CHINS proceedings for a child and remove a child from his or her home, yet disregard various portions of the CHINS and termination statutes on several occasions and still terminate parental rights following the passage of time after a CHINS dispositional decree and a child's removal from the home.

*Id.* at 1112–13. We analyzed "a record replete with procedural irregularities throughout the CHINS and termination proceedings that [were] plain, numerous, and substantial." *Id.* at 1118. In particular, we discussed a total of seven substantial irregularities that, taken together, required reversal of the trial court's termination decision as a violation of procedural due process. *Id.* at 1117. Those irregularities were as follows: (1) the OFC admittedly failed to provide the parents with some, and perhaps, all of the case plans; (2) the termination petition did not comply with Indiana Code Section 31–34–2–4; (3) the original CHINS petition was unsigned and unverified; (4) no permanency hearing was ever held as required by Indiana Code Section 31–34–21–7; (5) several of the court's CHINS orders contained no written findings and conclusions as required by Indiana Code Section 31–34–19–10; (6) the court entered a no-contact order against the father without following statutory requirements; and (7) the father was deprived of his right to be present at CHINS hearings. We noted that we were not convinced that any one of the seven deficiencies, standing alone,

would have resulted in a due process violation. *Id.* at 1118.

Unlike in *A.P.*, the procedural deficiencies alleged by the parents in the case before us, if there are any, do not rise to the level of a constitutional violation. For example, in *A.P.*, 734 N.E.2d at 1114, the OFC failed to provide the parents with copies of some, and possibly all, of the case plans, which we found problematic because the parents "may have been deprived of some degree of notice as to what conduct on their part could lead to the termination" of their parental rights. Here, however, the parents do not complain that OFC failed to provide them with a case plan. Furthermore, there is no contention that the parties were ever deprived of their right to be present or that the trial court failed to conduct necessary hearings during the course of the CHINS and termination proceedings. We do not have the same concerns in the case before us today as we did in *A.P.* with respect to whether the parties were properly included in the proceedings, whether the OFC followed proper procedures in removing A.I., and whether the parties were adequately informed of what was required of them before A.I. would be returned to their care. The procedural irregularities in this case, if in fact there are any, do not amount to a procedural due process violation.

### B. Substantive Due Process

■■■ Jennifer next alleges that she was deprived of her substantive due process rights because the State violated her Fourteenth Amendment right to family integrity.[4] She argues that from the beginning of the CHINS proceeding, she was re-

---

4. In his brief, Alan argues in passing that the State violated his right to family integrity. However, he does not develop an argument as to how his rights were violated specifically, but instead focuses on the OFC's attempt to make Jennifer choose between him and A.I.

and that Jennifer was a good mother. He does not provide a sufficient analysis to preserve this issue on appeal with respect to him. Therefore, we address the substantive due process issue only with respect to Jennifer.

quired to choose between her husband and her child. She argues that she adequately cared for A.I. and that the OFC failed to provide any evidence that she or Alan harmed A.I. in the past or were likely to harm her in the future. She argues that as a result, "the State's interest in terminating [her] parental rights cannot survive strict scrutiny." Jennifer's Br. p. 29.

We need not specifically address Jennifer's substantive due process argument in depth because she mischaracterizes the bases upon which her parental rights were terminated. It is true that Alan was ordered on more than one occasion to leave the home and refrain from seeing Jennifer and A.I. and that he violated this order several times. The OFC and the trial court were justifiably concerned with Alan's presence in the home given the admitted history of domestic violence and substance abuse and with the allegations of sexual molestation. However, both parties were offered numerous services in an attempt to improve the living conditions and to prevent a further pattern of domestic violence. When those efforts failed and the pattern of domestic violence continued, the OFC was justified in keeping A.I. away from Alan and indeed had a responsibility to do so.

Furthermore, the trial court did not base the termination order on Jennifer's failure to leave Alan but rather on her own failure to accept responsibility and make the necessary changes to appropriately parent A.I. The trial court's termination order provides:

> both parents have a history of abusing prescription drugs and other illegal controlled substances, that the parents' marriage has times of discord and domestic violence, that the parents are transient and put their own interest before the child's, as they continue to not

support the child or make any significant changes on behalf of the child.

Alan's App. pp. 5–6. It is clear to us that the trial court based its decision to terminate Jennifer's parental rights on several factors that extend beyond her relationship with Alan, namely her own failure to manage her extensive substance abuse problem, her failure to maintain stable living conditions, her failure to support A.I., and her failure to make significant changes in her behavior to benefit A.I. Thus, Jennifer mischaracterizes the nature of the CHINS and termination proceedings and orders by suggesting that the only issue was Alan. She has failed to establish a due process violation.

## Conclusion

The trial court's findings are supported by the evidence and, therefore, support the decision to terminate the parties' parental rights. The parties have not demonstrated violations of their procedural or substantive due process rights. Therefore, we affirm the trial court's order terminating the parties' parental rights as to A.I.

Affirmed.

NAJAM, J., concurs.

SULLIVAN, J., concurs as to Parts I(B) and (C), Parts II(A) and (B) and concurs in result as to Part I(A).

## ORDER

This court having heretofore handed down its opinion in this appeal on February 24, 2005 marked Memorandum Decision, Not for Publication.

Comes now the Appellee, by counsel, and files herein Motion to Publish Memorandum Decision, alleging therein that the decision of this Court in this cause clarifies the meaning of "Removal" as the same is used in I.C. 31–35–2–4(b)(2)(B)(i).

Said Motion further alleges that the decision clarifies the issue of whether an amended CHINS petition must be filed when a new issue arises in a CHINS case after the factfinding and that the opinion clarifies and distinguishes its previous ruling in the case of *A.P. v. Porter County Office of Family and Children*, 734 N.E.2d 1107 (Ind.Ct.App.2002).

The Court having reviewed its opinion in this case, having examined said Motion to Publish and being duly advised, now finds that the motion to Publish should be granted.

IT IS THEREFORE ORDERED that the Appellee's Motion to Publish Memorandum Decision is GRANTED, and this Court's opinion heretofore handed down in this appeal on February 24, 2005, marked Memorandum Decision, Not for Publication, is now ORDERED PUBLISHED.

All Panel Judges Concur.