## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 10 2018, 10:32 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of: A.T.-S. (Minor Child),

and
B.S. (Father)

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

April 10, 2018

Court of Appeals Case No. 33A01-1710-JT-2527

Appeal from the Henry Circuit Court

The Honorable Bob A. Witham, Judge

Trial Court Cause No. 33C01-1609-JT-21

**Bradford, Judge.**

# Case Summary

[1]    Appellant-Respondent B.S.[1] ("Father") appeals the juvenile court's order terminating his parental rights in A.T.-S. ("Child"). Father raises the following restated issue on appeal: whether the juvenile court's termination order was clearly erroneous. Father also argues that the termination proceedings were tainted by a misunderstanding regarding the Interstate Compact on the Placement of Children ("ICPC"). Because we disagree, we affirm.

# Facts and Procedural History

[2]    The biological mother and Father were living together in Father's home in California in September of 2012. During that time, Father was arrested for misdemeanor domestic violence against Child's mother while she was pregnant with Child. Father pled guilty and was placed on probation. Father and Child's mother remained together and had Child in May of 2013. At some point after Child was born, Father and Child's mother separated. In January of 2015, Child's mother moved to Indiana with Child while Father remained in California.

[3]    On May 4, 2015, Appellee-Petitioner the Indiana Department of Child Services ("DCS") filed a petition alleging Child to be a child in need of services

---

[1] Child's mother signed an adoption consent and does not join in this appeal.

("CHINS").[2] The petition was based in large part on the mother's heroin abuse issues and that Father, who was still in California, knew of her ongoing substance abuse issues, but did nothing to protect Child from it. The juvenile court appointed an attorney to represent Father.

[4] On May 14, 2015, the juvenile court held a pretrial conference, and Father appeared telephonically and by counsel. Child's mother entered a factual basis upon which the juvenile court adjudicated Child a CHINS as to the mother.[3] Child was subsequently placed with a relative. (Ex. Vol. 4, 93).

[5] On July 13, 2015, the juvenile court held a fact-finding hearing as to Father. (Ex. Vol. 4, 94). Father failed to appear, but was present by counsel. (Ex. Vol. 4, 94). The juvenile court attempted to contact Father using a telephone number that he had provided to his counsel two different times during the hearing. (Ex. Vol. 4, 94). Evidence was presented at the hearing, and the matter was taken under advisement. (Ex. Vol. 4, 94).

[6] On July 22, 2015, the juvenile court entered its CHINS adjudication decree, finding, *inter alia*, that based on Father's criminal history, lack of relationship with Child, and his "lack of recognition of the seriousness of these proceedings" that Child was a CHINS. Ex. Vol. 4 p. 95.

---

[2] A petition for Child's half-brother G.W. was also filed at that time. G.W. is not Father's child.

[3] Child's mother was the custodial parent at that time.

[7]     On September 18, 2015, the juvenile court held a combined review and dispositional hearing.  Father failed to appear, but was present by counsel.  (Ex. Vol. 4, 95).  The juvenile court found that Father had not complied with Child's case plan and Child remained placed in a relative's care.  (Ex. Vol. 4, 95).

[8]     On December 18, 2015, the juvenile court held a review hearing.  Father failed to appear, but was present by counsel.  The juvenile court found that Father had "failed to participate in the case or visit [Child]."  Ex. Vol. 4 p. 50.  On July 1, 2016, the juvenile court held a hearing on whether to cease reunification efforts for Father.  Father failed to appear, but was present by counsel.  The juvenile court ordered efforts with Father to cease.  (Ex. Vol. 4 p. 116)

[9]     On October 27, 2016, the juvenile court held a review hearing.  Father appeared telephonically and was represented by counsel.  After the hearing, the juvenile court found, *inter alia*, that Father had not complied with Child's case plan.  (Ex. Vol. 4 p. 99).  On January 19, 2017, the juvenile court held a review hearing.  Father failed to appear, but was present by counsel.  The juvenile court found, *inter alia*, that Father had not complied with Child's case plan.  (Ex. Vol. 4 p. 100).

[10]    Meanwhile, on September 23, 2016, DCS had filed its petition to terminate Father's parental rights.  On April 20, July 13, and September 11, 2017, the juvenile court held the evidentiary hearing on DCS's petition to terminate Father's parental rights.  (App. pp. 6-7).  Father failed to appear at the April 20, 2017 hearing, but was present by counsel.  Father did appear telephonically at

the other two hearings. Based upon all of the evidence presented, the juvenile court issued an order granting DCS's petition for termination of parental rights on September 28, 2017. In doing so, the juvenile court made the following relevant findings:

18.) The Court conducted the trial proceedings on the termination petition on 9/11/2017 at which Family Case Manager, Hannah Burke, testified. The Court makes the following findings and inferences from this testimony, for purposes of these termination proceedings:

a) The Witness was employed by the Department of Child Services as a Family Case Manager;

b) Witness was the family case manager with the Department of Child Services for the majority of the case;

c) The Child's CHINS involvement was due in part to Mother's substance abuse, and in part to Father's inability or refusal to provide the Child with a safe and stable home environment;

d) Father was asked about his criminal history at the time of the Child's removal, but stated that there was no criminal history;

e) The witness was able to find criminal history for Father, in contradiction to Father's statements;

f) Father had substance abuse issues, as determined by statements from Mother and previous criminal convictions;

g) Father has domestic violence history, including domestic battery on the Child's Mother during the Mother's pregnancy with the Child;

h) During the criminal involvement, Father was also providing care in a parental role to the Child's half-sibling;

i) Father did not provide DCS with any information as to completing any treatment for substance abuse or domestic violence;

j) Father has not complied with DCS or the Dispositional Order;

k) Paternity has been established in California through a paternity action under cause 14FSO196;

l) Father was ordered to pay Child support for the Child;

m) The Court in Kings County California had issued a warrant for Father in the paternity action for non-compliance with the Court's order;

n) Father did not seek to establish custody of the Child in the pending paternity action;

o) Father has never visited the Child;

p) Father has not provided for the Child's basic needs;

q) Father knew where the Child was prior to DCS involvement, but did not come to Indiana to provide for her care;

r) Father has not seen the Child since well before the Child was relocated to Indiana;

s) The Child is thriving in placement;

t) The Child is currently living with her half-brother, who is 7 years older than the Child;

u) The Child and her brother have been together through the entirety of the Child's life;

v) Child's brother has provided the majority of the Child's care prior to removal;

w) Child and her brother are closely bonded and it would be detrimental to separate the Children;

x) Child's brother is more of a Father-figure to the Child than the Child's Father;

y) Child has no relationship with Father. She is four years old and has not seen Father since on or before her first birthday;

z) Throughout the duration of the CHINS matter, Father has never come to Indiana to pursue reunification or provide for the care of his Child;

aa) It would be detrimental for the Child to delay permanency in an attempt to give Father more time to improve in his ability to provide for the care of the Child;

bb) It is in the Child's best interest for her Father's parental rights to be terminated and for her to be adopted; and

cc) Mother has signed a consent to adoption.

19.) The Court finds the following facts and inferences from the testimony of Rachel Crabtree, who testified at the termination trial on 9/11/2017:

a) The witness is employed by the Department of Child Services as a Family Case Manager;

b) The witness has been the Family Case Manager for the Child since May, 2017;

c) Father has not reached out to FCM and has had no communication with the Department;

d) The Child is thriving in placement;

e) The Child is closely bonded with her half-brother;

f) The Child and her half-brother have been together for the entirety of the Child's life;

g) It would be detrimental to separate the Children;

h) It is in the Child's best interest to have her parental rights terminated in regards to Father; and

i) Mother has signed a consent for adoption.

\* \* \*

22.) The extensive facts and inferences that have been found above lead to the following more categorical findings of fact now set forth:

a) The Child's Father has failed to establish or maintain a relationship with the Child since well before the opening of the related CHINS proceedings in this county for the Child, and including the period of approximately 2 years of the CHINS case itself;

b) The Child's Father has failed to benefit from multiple ordered reunification services, indicating his inability or refusal to make improvements in his ability to care for the Child. Father provided no information to contradict evidence of substance abuse and domestic violence. He provided no information as to treatment or services for either substance abuse or domestic violence. Despite the distance, Father could have utilized services available to him in California to improve in his ability to care for the Child. However, Father failed to do so, as he has not been motivated to reunify with the Child.

c) None of the conditions resulting in the Child's removal from the parents' home and care have been remedied or even addressed by the Child's Father.

\* \* \*

25.) The Child's DCS case managers and relative caregiver have all testified that termination of the parent-Child relationship and adoption of the Child are in her best interests. The Court agrees with these opinions, and now accepts and adopts them as its own finding of fact in these proceedings.

App. Vol. 2 pp. 44–47.

# Discussion and Decision

[11] This court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). When reviewing a termination of parental rights case, we will consider only the evidence and reasonable inferences that are most favorable to the judgment. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.* Thus, we will not reweigh the evidence or judge the credibility of the witnesses. *Id.* We will only set aside the court judgment terminating a parent-child relationship if it is clearly erroneous. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008).

[12] The traditional right of a parent to establish a home and raise his children is protected by the Fourteenth Amendment to the United States Constitution. *Bester v. Lake Cnty. Office of Family and Children*, 839 N.E.2d 143, 145 (Ind. 2005). Furthermore, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id.* However, parental rights are not absolute and the law allows for the termination of such rights when a parent is unable or unwilling to meet his responsibilities as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans denied.* The purpose of terminating parental rights is to protect the child, not to punish the parent. *Id.* The juvenile court may terminate the parental rights if the child's emotional and physical development is threatened. *Id.* The juvenile court need not wait until the child has suffered from irreversible harm. *Id.*

Before an involuntary termination of parental rights could occur in this case, DCS is required to prove by clear and convincing evidence that:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> ***
>
> (C) termination is in the best interests of the child[.]

Ind. Code § 31-35-2-4(b)(2). DCS's burden of proof for establishing these allegations in a termination case is one of "clear and convincing evidence." *In re G.Y.*, 904 N.E.2d 1257, 1260–61 (Ind. 2009).

# I. Termination Order

## A. Conditions Resulting in Removal Not Likely to Be Remedied

"We begin by emphasizing that a trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 372 (Ind. Ct. App. 2006). "When the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate." *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 2002).

[15] When determining whether there is a reasonable probability that a parent will remedy the conditions resulting in their child's removal from the home, a trial court engages in a two-step inquiry. First the trial court "must ascertain what conditions led to their placement and retention in foster care." *In re K.T.K.*, 989 N.E.2d 1225, 1231 (Ind. 2013). Second, the trial court must determine "whether there is a reasonable probability that those conditions will not be remedied." *Id*. The statute does not simply focus on the initial reason or reasons for removal, "but also those bases resulting in continued placement outside the home." *In re A.I. v. Vanderburgh Cnty. OFC*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005).

[16] Father argues that the evidence does not support the finding that there is a reasonable probability that the conditions that resulted in Child's removal will not be remedied. We cannot agree. DCS and the juvenile court both noted repeatedly over the course of the proceedings that Father failed to appear telephonically for the vast majority of the hearings and did not respond to DCS's attempts to provide services or arrange visitation with Child. Father has never visited Child despite the fact that he visits another child in St. Louis, Missouri, several times a year. At the time of the termination hearing, Father had not seen or even spoken to Child since approximately May of 2014. Given Father's history of not appearing at hearings, his lack of contact with DCS, and his lack of effort to create and maintain a relationship with Child, we conclude that the juvenile court did not err when it found that there was a reasonable

probability that the conditions that resulted in Child's removal would not be remedied.

[17] Father claims that he was unable to visit because of his job, but when asked if he could take a leave of absence or time off from his job, he replied "Yes." Tr. Vol. 3 pp. 29–30. A family case manager ("FCM") testified that "besides maintaining a source of income and stable housing" Father did nothing to improve his ability to have a relationship with Child or to parent Child. Tr. Vol. 2 p. 249. There is a great deal of evidence that shows that Father failed to attend court hearings in person or telephonically, failed to respond to messages from the juvenile court, he failed to keep in contact with DCS or his own attorney, and did not visit Child or maintain contact with Child in any way. Based upon the findings and other evidence before the juvenile court, it was not clearly erroneous to conclude that there was a reasonable probability that Father would not remedy the reasons for Child's not being in his care.

## II.   The Child's Best Interests

[18] Father also challenges the juvenile court's legal conclusion that termination was in Child's best interests. When reviewing such claims, we are mindful of the fact that the juvenile court is required to look beyond the factors identified by DCS and consider the totality of the circumstances. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In doing so, this court must subordinate the interests of the parent of the child involved. *Id.*

[19] In addressing whether continuation of the parent-child relationship is in Child's best interests, we note that FCM Hannah Burke testified that it was in Child's best interests to stay with and be adopted by the current relative placement. Such testimony is sufficient to support the juvenile court's conclusion in this regard. *See In re A.B.*, 887 N.E.2d 158, 170 (Ind. Ct. App. 2008). However, additional evidence further supports the juvenile court's conclusion. Child calls her relative caregivers "mom and dad." Tr. Vol. 3 p. 234. Child does not know Father. In fact, it has been so long that Child has had contact with Father that Child would not even be able to recognize Father's voice. "[S]he doesn't have any kind of relationship with him at no fault of her own[.]" Tr. Vol. 3 p. 237.

[20] FCM Rachel Crabtree testified that adoption and termination of parental rights were in Child's best interests. Her current placement also testified that it would be detrimental to Child if she were taken away from her half-brother and placed with Father in California. Child and her half-brother are "closely bonded with each other" and her half-brother has always looked out for her. Tr. Vol. 3 p. 34.

[21] In sum, Father's complete lack of effort to have a relationship with Child, as well as his lack of effort to participate in the CHINS proceedings and receive services from DCS, support the juvenile court's decision to terminate his parental rights. We decline his invitation to reweigh and reassess the evidence related to the challenged findings. We therefore conclude that the juvenile court did not clearly err in terminating Father's parental rights in Child.

# III. Interstate Compact on the Placement of Children

[22] Father also argues that DCS's misunderstanding of the ICPC process and its relevancy to this case "infected" the termination proceedings. Appellant's Br. p. 5. The ICPC, enacted in all fifty states, "provides a mechanism by which children can be sent to new foster or adoptive homes across state lines." *Bester v. Lake Cnty. Office of Family and Children*, 839 N.E.2d 143, 145 n.2 (Ind. 2005). The ICPC "includes a reporting requirement that allows a receiving state to investigate the fitness of the proposed home and to determine whether the child may be placed according to a proposed plan." *Id.* The conditions for placement under the ICPC "are designed to provide complete and accurate information regarding children and potential adoptive parents from a sending state to a receiving state and to involve public authorities in the process in order to ensure children have the opportunity to be placed in a suitable environment." *In re Adoption of Infants H.*, 904 N.E.2d 203, 208 (Ind. 2009).

[23] However, this court has squarely held that "the ICPC does not apply to placement with an out-of-state parent." *D.B. v. Ind. Dep't of Child Servs.*, 43 N.E. 3d 599, 604 (Ind. Ct. App. 2015). Article III of the ICPC sets forth the conditions for placement out of state:

> (a) A sending agency may not send, bring, or cause to be sent or brought into any other party state a child for placement in foster care or as a preliminary to a possible adoption unless the sending agency complies with each requirement under article III and with the receiving state's laws governing the placement of children.

(b) Before sending, bringing, or causing any child to be sent or brought into a receiving state for placement in foster care or as a preliminary to a possible adoption, the sending agency shall furnish the appropriate public authorities in the receiving state written notice of the intention to send, bring, or place the child in the receiving state....

Ind. Code § 31-28-4-1 art. III. It is clear from the language of the statute that the ICPC only applies to the placement of a child in foster care or as a preliminary to a possible adoption. Child was brought to Indiana by his mother. Child was not sent to Indiana to live in foster care or with a pre-adoptive parent. Therefore, to the extent that the juvenile court's termination order relied on the ICPC and Father's failure to successfully go through the process, we discount that basis of the ruling.

[24] The judgment of the juvenile court is affirmed.

Baker, J., and Kirsch, J., concur.